## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 05 2016, 9:09 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of the Termination of the Parent-Child Relationship of K.B. (Minor Child)

and

A.E. (Mother),
*Appellant-Respondent,*

v.

Indiana Department of Child Services,

July 5, 2016

Court of Appeals Case No. 82A01-1512-JT-2161

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

Trial Court Cause No. 82D04-1507-JT-1315



*Appellee-Plaintiff.*

**Bradford, Judge.**

# Case Summary

Appellant-Respondent A.E. ("Mother") appeals the juvenile court's order terminating her parental rights to K.B. (the "Child"). On October 20, 2014, Appellee-Petitioner the Department of Child Services ("DCS") filed a petition alleging that the Child was a child in need of services ("CHINS"). The next day, Mother stipulated that the Child was a CHINS. The Child was subsequently adjudicated to be a CHINS and Mother was ordered to participate in certain services. Mother, however, failed to consistently do so.

DCS filed a petition seeking the termination of Mother's parental rights to the Child on July 22, 2015. Following an evidentiary hearing, the juvenile court issued an order granting DCS's petition. On appeal, Mother contends that the juvenile court abused its discretion in denying her request for a continuance of the evidentiary hearing and that DCS did not provide sufficient evidence to support the termination of her parental rights. We affirm.

## Facts and Procedural History

[3] Mother and M.B. ("Father") are the parents of the Child who was born on November 24, 2012.[1] DCS initially became involved with the Child on October 14, 2014, after receiving a report that the Child's mother was being arrested for possession of methamphetamine. A DCS family case manager ("FCM") met with Mother at the jail on October 15, 2014, at which time Mother admitted that she would test positive for methamphetamine if given a drug screen. The Child was eventually placed with Mother's grandparents, who had guardianships over Mother's other children.

[4] On October 20, 2014, DCS filed a petition alleging that the Child was a CHINS.[2] The next day, Mother stipulated to the fact that the Child was a CHINS. In light of this stipulation, the juvenile court adjudicated the Child to be a CHINS. The juvenile court also ordered Mother to undergo a drug court evaluation. Mother was accepted into drug court on October 27, 2014. Following a November 12, 2014 dispositional hearing, Mother was ordered to complete certain services, namely cooperate with parental aide services, obtain a substance abuse evaluation and follow any treatment recommendation,

---

[1] The termination of Father's parental rights to the Child is not at issue in the instant appeal. We will therefore limit our factual overview and discussion to facts and issues pertaining to Mother.

[2] It appears that on or about October 20, 2014, Mother bonded out of jail following her October 14, 2014 arrest.

complete random drug screens, participate in supervised or monitored visitation, and remain drug and alcohol free.

[5] In December of 2014, Mother again began using methamphetamine. At this time, she stopped attending court dates, participating in services, and visiting the Child. Mother's relapse into drug use occurred after she had been given the opportunity to move in with her grandparents and her children. Mother, however, chose not to live with her grandparents and children, instead choosing to live with friends and continue to use drugs. Mother's relapse lasted from December of 2014 until April of 2015, when she was again arrested for possession of methamphetamine.

[6] On January 7, 2015, DCS filed a verified information for contempt alleging that Mother had failed to appear for drug screens and treatment. The juvenile court set the matter for a hearing on January 21, 2015. Mother failed to appear at this hearing. Mother was unsuccessfully discharged from the drug court on March 18, 2015, "as her whereabouts [were] unknown." DCS Ex. 1, p. 5. Mother also failed to appear for an April 1, 2015 review hearing, after which the juvenile court found that Mother had not complied with the case plan, enhanced her parenting abilities, or visited the Child.

[7] On May 12, 2015, in connection to the charges stemming from Mother's October 2014 arrest, the State filed an allegation that Mother was a habitual offender. On July 21, 2015, Mother pled guilty to Level 5 felony possession of methamphetamine, Class A misdemeanor possession of paraphernalia, Class A

misdemeanor driving while suspended, and Class B misdemeanor possession of marijuana. Mother was found to be a habitual offender and was sentenced to an aggregate term of six years. In sentencing Mother, the criminal court requested that the DOC place Mother in a Therapeutic Community Program (a "therapeutic program"). As of the date of the fact-finding hearing, Mother was waiting to be admitted into the therapeutic program, completion of which would take a minimum of nine months once Mother was admitted.[3] Upon completion of the therapeutic program, Mother would then have the opportunity to potentially obtain an early release from prison.

[8] On July 22, 2015, DCS filed a petition seeking the termination of Mother's parental rights to the Child. The juvenile court conducted an evidentiary hearing on DCS's petition on September 24, 2015. The juvenile court took the matter under advisement and, on November 25, 2015, issued an order terminating Mother's parental rights to the Child. This appeal follows.

# Discussion and Decision

---

[3] The record reveals that while the therapeutic program could potentially be completed in a minimum of nine months, completion of the therapeutic program could also take much longer.

# I. Denial of Motion for Continuance

On appeal, Mother contends that the juvenile court abused its discretion in denying her motion for a continuance of the fact-finding hearing on DCS's petition to terminate her parental rights.

> The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court. *Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 311 (Ind. Ct. App. 2000). We will reverse the trial court only for an abuse of that discretion. *Id.* An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion. *Id.* However, no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial. *Id.*

*Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006). Indiana Trial Rule 53.5 provides that a continuance "shall be allowed upon a showing of good cause established by affidavit or other evidence." In considering whether a requesting party made a showing of good cause, the juvenile court must consider the circumstances present in the case, "particularly in the reasons presented to the [juvenile court] at the time the request" was made. *F.M. v. N.B.*, 979 N.E.2d 1036, 1040 (Ind. Ct. App. 2012) (internal quotation omitted). Upon review, no abuse of discretion will be found when the moving party has not demonstrated that she was prejudiced by the denial, *Rowlett*, 841 N.E.2d at 619, or that she was "free from fault." *Danner v. Danner*, 573 N.E.2d 934, 937 (Ind. Ct. App. 1991), *trans. denied*.

[10]    In arguing that the juvenile court abused its discretion by denying her motion for a continuance, Mother asserts that although DCS's petition to terminate her parental rights complied with the statutory requirement that the Child be removed from her care pursuant to a dispositional decree for at least six months, *see* Ind. Code § 31-35-2-4(b)(2)(A), DCS should have nonetheless waited longer before filing the petition. Specifically, Mother asserts that while she was incarcerated at the time of the fact-finding hearing and was scheduled for a July 2017 release date, she was waiting to be admitted into a therapeutic program and that upon successful completion of the therapeutic program, she would be afforded the opportunity to petition for early release. Mother further asserts that she believed she could potentially be released in as few as nine months. In light of the possibility that she may obtain an early release, Mother argues that she should have been granted the opportunity to complete the court ordered services upon her release. We disagree.

[11]    Mother claims that her situation is similar to that presented in *Rowlett*. The facts presented in *Rowlett* indicate that although the Appellant was incarcerated as of the date of the dispositional hearing, he was scheduled to be released six weeks after the scheduled dispositional hearing. 841 N.E.2d at 619. Despite being unable to complete the court ordered services, during his incarceration, the Appellant had participated in numerous services and programs "which would be helpful to him in reaching his goal of reunification with his children." *Id.* Upon review, we concluded that the relatively short delay would have had little impact on the children who were placed with their maternal grandmother

who had agreed to adopt the children if Appellant's parental rights were terminated. *Id*.

[12] Here, unlike in *Rowlett*, Mother was not scheduled to be released within a relatively short time period following the fact-finding hearing. Rather, as of the date of the fact-finding hearing, Mother was not scheduled to be released until July of 2017. Further, Mother's earliest possible release date, which was by no means a guarantee, was at least nine months following the scheduled fact-finding hearing. This potential early release date was contingent upon Mother being admitted to and successfully completing the therapeutic program. It was also contingent upon Mother requesting and being granted an early release date upon completion of the therapeutic program.

[13] Further, as DCS points out, although Mother had initially participated in visitation with the Child and participated in services, prior to Mother's current term of incarceration, Mother had relapsed into her habit of using illegal drugs and had stopped participating in visitation or services. In fact, Mother had been given the opportunity to live with maternal great-grandparents and the Child, but had instead chose to live with friends and have no contact with the Child. The evidence indicates that Mother showed little interest in parenting the Child or completing the court-ordered services until becoming incarcerated. The evidence further indicates that the Child would benefit from the permanent placement with and possible adoption by extended family members who lived in Wisconsin.

Given the uncertainty surrounding Mother's release date and the seemingly legitimate concern for whether Mother was actually interested in completing the necessary services and parenting the Child, the juvenile court determined that Mother had failed to show good cause for granting her request for a continuance. Upon review, we cannot say that the juvenile court's determination was an abuse of discretion. As such, we affirm the denial of Mother's request for a continuance.

## II. Sufficiency of the Evidence

Mother also contends that the evidence is insufficient to sustain the termination of her parental rights to the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's

emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[17] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[18] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[19] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:

    (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

    (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

    (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Mother does not dispute that DCS presented sufficient evidence to support the first and fourth elements set forth in Indiana Code section 31-35-2-4(b). Mother, however, does claim that DCS failed to establish the second and third elements that are required to be proven before a court can order the involuntary termination of a parent's parental rights.

# A. Whether Conditions Will Be Remedied

[20] On appeal, Mother argues that DCS failed to establish by clear and convincing evidence both that the conditions leading to the Child's removal from her home would not be remedied and that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Child.

[21] It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, *or* (3) the child has been adjudicated CHINS on two separate occasions. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where the juvenile court determines one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile court to find, either of the other two factors listed in Indiana Code section 31-34-2-4(b)(2)(B). *See generally In re S.P.H.*, 806 N.E.2d at 882 (providing that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only prove and the juvenile court need only find that one of the factors listed in that sub-section is true).

[22] In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place the Child outside

of Mother's care or to continue the Child's placement outside Mother's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying the children's removal or continued placement outside their parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for the children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[23]     Here, the juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Child's removal from and continued placement outside of Mother's care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination, the juvenile court found as follows:

> 10.     On October 16, 2014, [the Child] was in his Mother's car and care, when the Mother was arrested for possession of Methamphetamine, possession of paraph[ernalia], possession of marijuana and driving while license suspended.
>
> ****
>
> 16.     On October 27, 2014, Mother was ordered into the Vanderburgh County Drug Court Treatment.
>
> 17.     Mother was given a bond in her criminal case and was released on bond.
>
> 18.     On November 12, 2015, the Court entered its Dispositional Order, DCS was granted wardship of Child, and the Mother was ordered to (1) participate with a parent aid, (2) obtain a substance abuse evaluation, (3) [complete r]andom [d]rug [s]creens, (4) [participate in s]upervised and monitored visits with the child, and (5) remain drug and alcohol free.
>
> ****
>
> 20.     After the Dispositional Hearing, Mother participated in supervised visits, secured a job, obtained a substance abuse evaluation, completed orientation for drug treatment, submitted to random drug screens and actively participated in [d]rug [c]ourt.
>
> 21.     Less than a month after disposition was held, the Mother's participation in her Court ordered services began to diminish.
>
> 22.     On or about December 2, 2014, Mother failed to appear for a random drug screen.
>
> 23.     On December 3, 201[4], Mother was sanctioned by the [d]rug [c]ourt [t]eam for not complying with the [d]rug [c]ourt

requirements.

24. Mother quit her job and began living with friends.

25. While Mother was living with friends, [the Child] was living with his great-grandparents. [The Child's] great-grand[m]other is over the age of 68 and suffers from diabetes and his great[-]grandfather is over 65 and still works to provide for [the Child] and his siblings.

26. Early in the case, the FCM recognized the great-grandparents['] restrictions and encouraged the Mother to work [on] her services so that she could move into her grandparent's home and help care for her son.

27. On or about December 7, 2014, the family case manager stopped supervised visits through [the service provider] and allowed [the Child's] [g]reat-[g]randparents to supervise his visits with his Mother.

28. On or about December 23, 2014, Mother was approved to move in with her grandparents in order to help care for her child.

29. Despite having been approved to move in with her son, the Mother never took advantage of this opportunity or if she did it was for only a few days. Instead, the Mother responded by quitting all services and intentionally removing herself from the case.

30. Mother stopped calling or attending random drug screens, participating in Court ordered drug treatment, appearing and complying with [d]rug [c]ourt, communicating with the family case manager and working with her parent aid. Mother testified that she relapsed on methamphetamine around this time.

31. After Mother's relapse and non-compliance, Mother's visits were stopped and Mother never visited with [the Child] again.

32. On January 5, 2015, the DCS filed an information for contempt against the Mother. DCS'[s] motion was never heard by this Court because Mother failed to appear to be advised.

33. On January 20, 2015, Mother failed to appear in her pending criminal case and her bond was revoked. [ ] Mother was issued a no bond warrant for her arrest.

34. On January 21, 2015, Mother failed to appear for her

regularly scheduled [d]rug [c]ourt hearing and this Court issued a no bond writ on [ ] Mother.

35. [The Child's] case progressed while the Mother was absent from his life. DCS had to make a decision on behalf of the [C]hild. Soon after Mother's disappearance, it became apparent that [the Child's] [g]reat-[g]randparents were not willing or able to care for the toddler long term. The [g]reat-[g]randparents presented DCS with names of relatives living out of town.

36. The FCM started looking at this placement option and found that the relatives lived out of state. The FCM started the necessary Interstate Compact on Placement of Children (ICPC) process. At the time the ICPC was being sought, the permanency plan was reunification with the Mother.

37. On or about January 28, 2015, the Mother contacted the FCM. The Mother was updated about potential ICPC. Mother was also informed that DCS filed an information for contempt against her and that this Court had issued a no bond writ for her arrest. Mother was also made aware of her warrant for failing to appear for her criminal case.

38. The FCM testified that the Mother claimed that she was going to turn herself into the authorities. Mother testified that she considered turning herself in and told the FCM that she would do so. However, Mother failed to ever turn herself in.

39. The Mother knew that her child was a ward and Mother was well aware that decisions were being made for her child, yet the Mother never attempted to come forth to re-engage in services. After the Mother called the FCM in January, Mother never again reached out to the Department to check on her son's overall wellbeing.

40. On March 18, 2015, due to Mother's disappearance and lack of commitment, Mother was unsuccessfully discharged from the Vanderburgh County CHINS Drug Court Program.

41. On April 1, 2015, this Court held a review hearing in [the Child's] case. Despite having notice of the hearing, Mother failed to appear. The Court was updated on the ICPC.

42. The [C]hild's father was present at the hearing. Father did not object to the ICPC.

43.    On or about April 20, 2015[,] Mother was arrested and charged once again with possession of methamphetamine[ ] and driving while suspended.

44.    On April 23, 2015[,] Mother appeared before this Court. Mother[ ] was updated on the case.

45.    On April 28, 2015, Mother went in on her previous criminal matter.  Mother was ordered to remain in custody.

46.    On May 17, 2015, the State charged the Mother as a habitual offender.

47.    On June, 2, 2015, Mother appeared before this Court in custody and by counsel.  Mother requested that the [C]hild's [g]reat-[g]randparents obtain guardianship.  The [C]hild's [g]reat-[g]randparents indicated that they could not become the guardian of the [C]hild.  Mother was informed that DCS would be filing [a petition for] termination [of her parental rights].

48.    On July 21, 2015, Mother entered a guilty plea of Possession of Methamphetamine, with enhancement of a habitual offender, Possession of Paraphernalia, Driving While Suspended, and Possession of Marijuana.

49.    Mother was sentenced to a total of [six] years.  The Mother's current out date is listed as July of 2017.  According to the Mother's [p]lea agreement, Mother will be purposefully incarcerated.  Mother is ordered to be placed in a Therapeutic Community program and if Mother successfully completes her program, [ ] Mother can request a modification of her sentence. (*At Mother's [t]ermination hearing, Mother was still on the waiting list to enter the program.*)  Best case scenario [M]other will be released in a little over nine months.

50.    At the Permanency Hearing, held on September 16, 2015, the Court was informed that the ICPC was approved.  The Court granted permission to move the [C]hild to Wisconsin.

51.    At Mother's [t]ermination hearing, Mother did not introduce any evidence showing that she had successfully completed any services to aid in her ability to care for the [C]hild.

52.    This Court finds that the Mother purposely went on the run and continued to use meth[amphetamine] for several months knowing she could not have contact with her child and was

risking losing her parental rights.

53. Mother at this time has good intentions, but no guarantees on how she would care for [the Child] when she is released from prison. She is hoping to live at the YWCA and find employment, but only time will tell if she is able to do so.

54. Further, the Court is unable to give much credibility to the Mother's testimony that she was never offered services to deal with her substance abuse. In the underlying CHINS case, [ ] Mother was accepted and participated in the CHINS [d]rug [c]ourt, the most intensive service available. [M]other appeared weekly starting on 10-29-14 through 12-30-14 at which time she voluntarily failed to appear in Court. [M]other was engaged in outpatient treatment and AA meetings, even though she did not attend all of them as ordered. Upon her failing to appear, [M]other could have reappeared for court, turned herself into jail, reengaged in drug treatment, detox or inpatient. She failed to do so. Now that she is incarcerated she claims this next time will be different. Unfortunately, statistics indicate that it would be a real long shot for her to be successful and nothing in her past would show that she has a realistic chance. She has already lost her other children to guardianships in the past, but continued with her life style. In this case, it was noted by the case manager that when given the opportunity to be with her children she instead chose a boyfriend.

55. In looking at [M]other's criminal history, [M]other also has failed multiple times to comply with a Court's orders and be rehabilitated. While on probation in 82C01-0508-FC-906, [M]other was charged with two new misdemeanors, failed to report to probation, failed to complete community service[,] and failed to pay restitution. In 82C01-0805-FC-489, [M]other failed to appear in court, had 23 incident reports while at the VCCC (The local work release facility) and tested positive for meth[amphetamine]. In 82D03-1410-F5-4101, [M]other, as stated earlier, absconded and picked up her latest felony, again for possession of meth[amphetaimine].

56. The Court, in looking at the Mother's status at her Termination Hearing and balancing her previous criminal

history; the Court finds the reasons for removal are not likely to be remedied.

57. At the Termination Hearing, Mother testified that she was previous[ly] convicted of felonies. The evidence confirms that every felony conviction resulted in [ ] Mother spending time in prison. The evidence also shows that Mother's three prior children were never reunified with [ ] Mother.

58. In light of Mother's past conduct, coupled with her current status, the Court does not find Mother's claims that she will care for [the Child] once she is released from prison to be persuasive.

59. Throughout the underlying CHINS case, Mother never attempted to demonstrate that she was ready, able[,] or willing to parent [the Child].

60. No service provider could recommend that Mother should be reunified with [the Child].

Appellant's App. pp. 18-23 (emphasis in original). In light of these findings, the juvenile court concluded that DCS had established by clear and convincing evidence that the reasons for the Children's removal from and continued placement outside Mother's home would not be remedied.

[24] We note that in claiming that the evidence was insufficient to support the juvenile court's order terminating her parental rights, Mother does not challenge the sufficiency of the evidence to support any of the juvenile court's findings. As a result, Mother has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992 (providing that when an appealing party fails to challenge the findings of the trial court, the findings must be accepted as correct); *In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenge findings resulted in waiver of argument that findings were

clearly erroneous), *trans. denied*. We will therefore limit our review to whether these unchallenged findings are sufficient to support the juvenile court's conclusion that the conditions that led to the Child's removal from and continued placement outside Mother's care would not be remedied.

[25] On appeal, Mother asserts that DCS failed to prove that the therapeutic program, which focused intensively on substance abuse relapse prevention, would not remedy the cause for the Child's removal from her care. Mother also asserts that in finding that while Mother had good intentions, but that there were no guarantees that she would ever be able to successfully care for the Child, the juvenile court "shifted the burden of proof" from DCS to Mother. Appellant's Br. p. 15. We disagree with Mother's assertion that the juvenile court shifted the burden to Mother. Instead, the juvenile court considered the overwhelming evidence of Mother's habitual patterns of criminal activity, drug abuse, and failure to support her children. In fact, when given the opportunity to live with and help care for the Child, Mother instead chose to cut off all contact with the Child and continue using drugs. Mother had also failed to respond to previous attempts to help her recover from her problems with substance abuse.

[26] In making these assertions, Mother relies heavily on her own self-serving testimony. It is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297

(Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Mother's challenge to the sufficiency of the evidence to support the conclusions of the juvenile court effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[27] Upon review, we conclude that the juvenile court did not err in concluding that the conditions leading to the Child's removal from and continued placement outside's Mother's care were unlikely to be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to the Children's well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

## B. Best Interests of the Child

[28] Initially, we note that although Mother also contends that DCS failed to prove by clear and convincing evidence that termination of her parental rights was in the Child's best interests, Mother presents no argument in support of this contention. Mother, therefore, has waived her claim of error. *See Burnett v. Cincinnati Ins. Co*, 690 N.E.2d 747, 749 (Ind. Ct. App. 1998) (providing that failure of a party to present a cogent argument in her brief is considered a

waiver of that issue). However, despite Mother's waiver, we will nonetheless review the sufficiency of the evidence to sustain the conclusion that termination was in the Child's best interests.

[29] We are mindful that in considering whether termination of one's parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id.* Furthermore, this court has previously determined that the testimony of the case worker or a Court Appointed Special Advocate ("CASA") regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id.*; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[30] Here, the juvenile court found that evidence established that the Child has a need for permanency and stability and that the termination of Mother's parental rights would serve the Child's best interests. Specifically, the juvenile court found as follows:

> 61. The CASA, testified that adoption and termination of Mother's parental rights was in [the] Child's best interests. The CASA also filed a written report supporting this position. [The] CASA also testified that there are no other permanency options available as the current placement wishes to adopt instead of having a guardianship. This is not unusual in these types of cases as loved ones, related or not, understand that real permanency is through adoption and the mere possibility of a mother later trying to get their child back can have very detrimental effects on the family and the child. The law does not require a "less"

permanent relationship be granted by a Court. [ ] DCS must only prove the elements in a termination case. The law is written as such for good reason. Further, the law allows [ ] DCS to file for termination when they did in this case. This Court cannot not terminate a parent's right just because [ ] DCS did not wait until a later date. This Court must weigh the evidence as it is presented. The Court understands the natural reaction to want to give [M]other another chance, but nothing in this record indicates that [M]other will be successful. Admittedly she is doing well in prison, but prison is not everyday life. [M]other has been in and out of jail in the past, but that did not change her. She also wasn't successful at a work release facility or in her underlying CHINS case.

62. [M]other has maintained contact now that she is in jail, but children need more stability than contact when a parent is in jail. The Court has little doubt that if [M]other had not been caught and arrested she would have continued to use and [have] little or no contact with her child. This Court understands that addicts do not always think clearly, but addicts are not continually 24/7 too strung out to get help or make contact with their child. There is nothing in the record to suggest that this mother was totally incapacitated. She avoided police for months. She talked to her Case Manager.

63. The FCM testified that after Mother was informed in January, 2015[,] about the plans for her child, Mother never called again to inquire as to [the Child's] condition and wellbeing, or to see about scheduling visitations. The FCM testified that the [C]hild needs permanency and that it was in the [C]hild's best interest for Mother's rights to be terminated.

64. DCS'[s] plan for Child is that he be adopted; this plan is satisfactory for Child's care and treatment.

Appellant's App. pp. 23-24. Again, Mother does not challenge the sufficiency of the evidence to support these findings.

Further, review of the record reveals that although Mother initially agreed to participate in services, her participation was short-lived and she voluntarily cut off all communication with the Child when she chose to live with friends and partake in illegal drugs rather than live with her grandparents and the Child. Mother displayed little to no interest in parenting the Child until her instant incarceration. Both FCM Ellen Moore and the Child's CASA testified that they believed that the termination of Mother's parental rights was in the Child's best interests.

The juvenile court did not have to wait until the Child was irreversibly harmed such that his physical, mental, and social development was permanently impaired before terminating Mother's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of FCM Moore and the Child's CASA, considered with the juvenile court's unchallenged factual findings and Mother's failure to participate in or successfully complete the court-ordered services when given the opportunity, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Mother's parental rights is in the Child's best interests. Again, Mother's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

# Conclusion

Having concluded that the juvenile court did not abuse its discretion in denying Mother's request for a continuance and that the evidence is sufficient to support

the juvenile court's order terminating Mother's parental rights to the Child, we affirm the judgment of the juvenile court.

[34] The judgment of the juvenile court is affirmed.

Bailey, J., and Altice, J., concur.