# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2016, 7:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of J.P.: | November 30, 2016 |
| J.S. (Father), | Court of Appeals Case No. 49A02-1605-JT-1029 |
| *Appellant-Respondent,* | |
| v. | Appeal from the Marion Superior Court |
| | The Honorable Larry D. Bradley, Magistrate |
| The Indiana Department of Child Services, | The Honorable Marilyn Moores, Judge |
| *Appellee-Petitioner.* | Trial Court Cause No. 49D09-1506-JT-435 |

**Vaidik, Chief Judge.**

# Case Summary

[1]     J.S. ("Father") appeals the termination of his parental rights to his son.  He contends that the juvenile court abused its discretion in denying his motion to continue the termination hearing and that there is insufficient evidence to support the termination of his parental rights.  Finding no error, we affirm.

# Facts and Procedural History

[2]     D.P. ("Mother") and Father started dating in 2007 and have one child together, J.P., born February 3, 2009.  According to Father, he has "been in and out of jail a lot in [his] lifetime."  Tr. p. 159.  In fact, Father was in jail when J.P. was born.

[3]     In March 2013, when J.P. was four years old, Father, age thirty-one, was arrested for—and later pled guilty to—Class C felony sexual misconduct with a minor; the victim was a fifteen-year-old female from out-of-state.  Father was incarcerated from March 2013 until October 1, 2014.

[4]     In February 2014, while Father was in prison, the Department of Child Services (DCS) received a report that J.P. was being neglected in Mother's care.  J.P. was removed from Mother and placed in foster care.  The following month, DCS filed a petition alleging that J.P. was a child in need of services (CHINS) based on Mother's drug abuse and Father's incarceration.  *See* Ex. 1, ¶ 4A.  In June, while the CHINS case was pending, Mother died from a drug overdose.

DCS placed J.P. with Father's sister in September 2014. Father was then released to parole on October 1. DCS was prepared to offer Father services when he was released from prison. One of Father's parole conditions prohibited him from having contact with any children, including his own child, "without written approval in advance by [his] parole agent in consultation with [his] treatment provider." Ex. I, ¶ 4(A). Father initialed this condition. *Id.* When he was released from prison, Father—without approval from his parole agent—went to his sister's house to see J.P. He was eventually sent back to prison for violating parole and remained there until December 15, 2015. Based on these events, J.P. was removed from Father's sister and placed with his maternal grandmother in Florida.[1] J.P. has been living with his maternal grandmother and her husband in Florida ever since.

In the meantime, after Father was sent back to prison, the juvenile court held the fact-finding hearing in the CHINS case. The juvenile court found that J.P. was a CHINS:

> Court finds [F]ather is incarcerated pending possible parole violation. If [F]ather is violated he will be incarcerated until 2017. If [F]ather is not violated his parole conditions will prohibit him from having contact with any minor child for a minimum of one year. Therefore, the Court finds [J.P.] is a child in need of services.

---

[1] Mother had another child, T.G., who was born in March 2012; T.G. has a different father. T.G. also lives with maternal grandmother in Florida. T.G. and J.P. have a close sibling bond.

Ex. 17. As part of the dispositional decree, the juvenile court issued a parental-participation order that required Father to "contact DCS upon his release from incarceration." Ex. 19.

[7] In June 2015, while Father was in prison for violating parole, DCS filed a petition to terminate his parental rights to J.P. While this petition was pending, Father was released to parole for a second time on December 15, 2015; Father's parole ends in March 2017. Father is again subject to the parole condition that prohibits him from having contact with any children, including his own child. *See* Ex. 29. Contrary to the juvenile court's parental-participation order in the CHINS case, Father did not contact DCS when he was released from prison in December 2015.

[8] Father did, however, appear for a periodic review hearing in the CHINS case in February 2016, about two months after his release. Father's attorney requested services for Father and noted that Father was attempting to have his parole condition modified so that he could see his son. Ex. 22. DCS objected to Father's request for services on grounds that Father had not made any efforts since his release in December and said that it intended to move forward with termination and that the hearing was set for March 22. *Id.*; *see also* Appellant's App. p. 83. The juvenile court denied Father's request for services.

[9] Two weeks before the termination hearing, Father filed a motion to continue based on the following:

> Counsel will be requesting that the Parole Board lift [the] stipulation [that prohibits Father from having contact with any children]. Counsel has been diligently working with [Father's] criminal defense attorney as well as his parole officer . . ., and only recently learned it will need to go to the Parole Board. Counsel needs additional time before the trial to make this request from the Parole Board.

Appellant's App. p. 74 (formatting altered). DCS objected to Father's motion to continue. Following a hearing, the juvenile court denied the motion. *Id.* at 84. The court explained that Father should have made these efforts back in October 2014, not in March 2016. Tr. p. 4.

[10] The termination hearing was held as scheduled on March 22, 2016. J.P. was seven years old at the time. Family Case Manager (FCM) Denise Deen testified that Father did not have a bond with J.P. and that with the exception of one day in October 2014, Father had not seen J.P. since March 2013 when J.P. was four years old. Tr. p. 43, 52; Appellant's App. p. 18 (Finding No. 25). FCM Deen explained that J.P. needed permanency and that his maternal grandmother in Florida—where J.P. had been living since October 2014— provided that permanency. FCM Deen said J.P. was "doing well" and was "very happy" and "bonded to his grandmother." Tr. p. 41. FCM Deen believed that termination was in J.P.'s best interests. *Id.* at 43. Guardian ad Litem (GAL) Earlon Hollowell testified that J.P. had consistently told him that he wanted to live with his maternal grandmother and that J.P. had never mentioned Father to him. GAL Hollowell agreed that termination was in J.P.'s best interests because of the stability that his maternal grandmother provided,

Father's criminal history, and the fact that Father was not able to see J.P. for yet another year. Father testified that he has three felony convictions (Class C felony robbery, Class D felony residential entry, and Class C felony sexual misconduct with a minor), two probation violations, and one parole violation. In addition, Father testified that there was a felony warrant for his arrest in Illinois for child endangerment; J.P. was the victim. Although Father did not know when this event occurred, he knew that it happened before his March 2013 arrest for sexual misconduct with a minor. Father explained that he took a few classes while incarcerated and that he currently had a job that paid $12.50/hour and that he was living week-to-week in a motel with hopes of finding permanent housing. *See* Appellant's App. p. 18 (Finding Nos. 26-28).

[11] The juvenile court entered an order terminating Father's parental rights to J.P. The court concluded, among other things, that termination was in J.P.'s best interests because it "would allow [J.P.] to be adopted into a stable and permanent home where [his] needs will be safely met" by his maternal grandmother and step-grandfather. *Id.* at 19. The court also concluded that there is a reasonable probability that the conditions resulting in J.P.'s removal and continued placement outside the home will not be remedied:

> Not only will [Father] not be available to parent for another year, [he] has three felony convictions and for each one he violated the terms of his probation or parole. He also has an outstanding warrant for a felony charge, and has spent a lot of time in and out of jail and [has therefore been] unavailable to parent. This criminal history, coupled with his pattern of violations presents a reasonable probability that [Father] will again be unavailable to

parent due to incarceration as he was at the beginning of [J.P.'s] CHINS case.

*Id.* at 18.

[12] Father now appeals.

# Discussion and Decision

[13] Father raises two issues on appeal. First, he challenges the trial court's denial of his motion to continue the termination hearing. Second, he contends that there is insufficient evidence to support the termination of his parental rights to J.P.

# I. Motion to Continue

[14] Father contends that the juvenile court abused its discretion in denying his motion to continue the termination hearing so that he could ask the Indiana Parole Board to modify the parole condition that prohibits him from having contact with any children, including J.P.[2] The decision to grant or deny a motion to continue rests within the sound discretion of the trial court. *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. We will reverse the trial court only for an abuse of that

---

[2] Father also argues that the juvenile court violated his rights to procedural due process and fundamental fairness when it denied his motion to continue, but Father does not sufficiently develop this constitutional argument. Thus, it is waived. *See* Ind. Appellate Rule 46(A)(8)(a).

discretion. *Id.* An abuse of discretion occurs when the moving party has shown good cause for granting the motion. *Id.*

[15] Father was released to parole on October 1, 2014. One of Father's parole conditions—which he initialed—prohibited him from having contact with any children, including his own child, "without written approval in advance by [his] parole agent in consultation with [his] treatment provider." Ex. I, ¶ 4(A). Without receiving this approval, Father went to his sister's house to see J.P. He was sent back to prison for violating parole and remained there until December 15, 2015, at which point he was released to parole for a second time. Father is again subject to the parole condition that prohibits him from having contact with any children, including his own child. His parole ends in March 2017. Two weeks before the March 22, 2016 termination hearing, Father filed a motion to continue so that he could take steps to see his son. The juvenile court denied Father's motion, finding that his efforts came too late. In other words, the court said that Father should have taken these steps back in October 2014 when he was released to parole for the first time, not in March 2016.

[16] We agree with the juvenile court that Father should have taken steps earlier to have this parole condition modified. Father knew about this parole condition in October 2014, was sent back to prison for over a year for violating it, yet did not take serious steps to have it modified until March 2016. Moreover, Father did not know his chances of having it modified. *See* Tr. p. 3-4 ("That is what we are trying to figure out at this point. We found out last week that that was the option and we have not been able to actually contact the parole board

yet."). In the meantime, J.P.—who had not seen Father since March 2013, could not have contact with Father until March 2017, and had no bond with Father—was living with his maternal grandmother in Florida in a stable, permanent, and happy environment. Given these facts, the trial court did not abuse its discretion in denying Father's motion to continue the termination hearing so that Father could take steps to **try** to have a parole condition he knew about for almost eighteen months modified so that he could have contact with J.P. *Cf. Rowlett*, 841 N.E.2d at 619-20, 622 (concluding that the juvenile court abused its discretion in denying father's motion to continue the termination hearing where father was incarcerated and set to be released six weeks after the scheduled termination hearing, completed over 1100 hours of services while incarcerated, and maintained a two-way relationship with his children—through phone calls and letters—while incarcerated).

# II. Insufficient Evidence

[17] Father next contends that there is insufficient evidence to support the termination of his parental rights to J.P. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.,* 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and

convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment. *In re V.A.,* 51 N.E.3d 1140, 1143 (Ind. 2016).

[18] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental right of a CHINS must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[19] Father does not challenge (C) or (D). Rather, he argues that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions that resulted in J.P.'s removal or reasons for

placement outside the home will not be remedied.[3]  Father correctly points out that the conditions that resulted in J.P.'s removal from Mother cannot be considered but rather only the reasons attributable to him can be considered. *See In re I.A.*, 934 N.E.2d 1127, 1133-34 (Ind. 2010) ("[A]t the time I.A. was removed, Mother and Father were not residing in the same household.  Instead I.A. was living with Mother and in her sole custody and care.  Thus the conditions that resulted in I.A.'s removal—lack of parental supervision— cannot be attributed to Father."); *see also V.A.*, 51 N.E.3d at 1146 ("[I]n order to determine whether there is a reasonable probability that the conditions necessitating V.A.'s removal will not be remedied such that termination of *Father's* rights is warranted, we must consider only those reasons attributable to Father."); *In re A.G.*, 45 N.E.3d 471, 476 (Ind. Ct. App. 2015) ("[T]here is no question that A.G. was constructively removed from Father.  When A.G. was removed from Mother shortly after his birth, Father was not living in the same home—he was in jail in Florida. . . .  As a result, DCS had no choice but to continue placement outside Father's home."), *trans. denied*.

[20]  In making this determination, the trial court engages in a two-step analysis.  First, the trial court must determine what conditions led DCS to placing J.P. in

---

[3] Father also argues that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to J.P.'s well-being.  Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).  Because we conclude that there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in J.P.'s removal and continued placement outside the home will not be remedied, we do not address this argument.

foster care and then retaining his out-of-home placement rather than placing him with Father. *I.A.*, 934 N.E.2d at 1134. Second, the trial court must determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of her future behavior. *Id.*

[21] Here, the record shows that when DCS got involved in February 2014 and removed J.P. from Mother, Father was incarcerated (and had been since March 2013) and thus was unable to care for J.P. As a result of Father's incarceration, DCS placed J.P. in foster care and ultimately with his maternal grandmother in Florida. Father remained incarcerated until December 2015. Accordingly, the condition that led DCS to place J.P. in foster care and to continue J.P.'s out-of-home placement rather than to place J.P. with Father was Father's incarceration.

[22] The trial court found that this condition was unlikely to be remedied given Father's criminal history as well as his history of violating parole and probation. Father has three felony convictions and a felony warrant for his arrest in Illinois for endangering J.P. According to Father, the Illinois case was "pending" at

the time of the termination hearing. Tr. p. 106. In addition, Father has violated probation twice and parole once. Father is currently on parole until March 2017. According to Father himself, he has "been in and out of jail a lot in [his] lifetime." *Id.* at 159. Indeed, Father was in jail when J.P. was born in 2009 and, with the exception of one day in October 2014, Father has not seen J.P. since March 2013 due to his incarceration or parole restrictions. Given the fact that Father has been in and out of jail "a lot" of his own life and for a large part of J.P.'s life and has a pending felony case in Illinois, the trial court's conclusion that there is a reasonable probability that Father's unavailability to parent due to incarceration will not be remedied is not clearly erroneous.[4]

[23] Affirmed.

Baker, J., and Najam, J., concur.

---

[4] Father argues that parental rights cannot be terminated based solely on a parent's criminal history. Father is correct as a general principle, because in order to terminate parental rights, DCS must also prove that termination is in the child's best interests. But Father does not challenge the trial court's determination that it is in J.P.'s bests interests to terminate Father's parental rights so that J.P. can be "adopted into a stable and permanent home where [his] needs will be safely met" by his maternal grandmother and step-grandfather. Appellant's App. p. 19. In other words, there is more to a best-interests analysis than a parent's criminal history.

Father also argues that the fact that he did not complete services through DCS and the fact that he did not contact DCS upon release from prison in December 2015 are not grounds for terminating his parental rights. But the trial court did not consider these facts in its analysis of this factor; we do not consider them either.