John ROWLETT, Father, Appellant–
Respondent,

v.

VANDERBURGH COUNTY OFFICE
OF FAMILY AND CHILDREN,
Appellee–Petitioner.

No. 82A01–0506–JV–244.

Court of Appeals of Indiana.

Feb. 1, 2006.

Transfer Denied April 27, 2006.

Erin L. Berger, Vanderburgh County Public Defender Agency, Evansville, for Appellant.

Katharine Vanost Jones, Evansville, for Appellee.

## OPINION

SULLIVAN, Judge.

Appellant, John Rowlett, challenges the trial court's order terminating his parental rights to his children, A.R. and C.R. Upon appeal, Rowlett presents two issues for our review: (1) whether the trial court abused its discretion in denying his motion for continuance of the termination hearing, and (2) whether the Vanderburgh County Office of Family and Children ("OFC") proved the statutory factors required to terminate parental rights by clear and convincing evidence.

We reverse.

The record reveals that Tosha Brooks ("Mother") and Rowlett ("Father") are the biological parents of C.R., born July 8, 1999, and A.R., born June 21, 2000.[1] On June 5, 2002, police responded to a report that C.R. and A.R. were running around outside unsupervised for more than thirty minutes.[2] The police then notified the OFC and requested the OFC investigate the living conditions at the home where C.R. and A.R. resided with Mother.[3] An investigator with the OFC arrived at the home and observed that the home was "very dirty" and in disrepair. Transcript at 64. Specifically, the investigator observed trash all over the floor, dirty dishes piled in the sink, and "old food" strewn throughout the home, including a package of bacon in Mother's bedroom, cheese slices on a coffee table, and "ketchup that was everywhere." Transcript at 61. The investigator also noted that a window was missing in the children's room through which the children could have easily climbed out, that the bed in the children's room was broken, and that an air conditioning vent was missing leaving a four-by-ten-inch hole in the floor in an area where the children had access. As for the children, the investigator noted that C.R. and A.R. were "very dirty" and wearing only pull-up diapers. Transcript at 60. While inspecting the conditions in the home, the investigator watched A.R. pull a hot dog out of the trash and take a bite of it.

Given the conditions of the home, the OFC took C.R. and A.R. into protective custody. As the investigator was getting ready to leave, Father arrived and asked to speak with the OFC investigator. The

1. Mother had a third child, P.B., who was born while Mother lived with Father, although Father was not the biological parent. P.B.'s biological father's parental rights were terminated in the same proceeding as Father's. This appeal concerns only the termination of Father's parental rights to C.R. and A.R.

2. Apparently, this was not the first time it had been reported that the children run around outside unsupervised for extended periods of time. In fact, in 2001, the OFC investigated a similar situation.

3. It is not disputed that Father did not live in the home with Mother and the children.

investigator asked Father to come to the OFC's offices so she could talk to him. At that meeting, Father admitted that he had recently been released from jail on drug-related charges[4] and explained that he was trying to establish paternity so he could get custody of C.R. and A.R. The OFC investigator told Father that the children could not be placed with him until he established paternity and further informed Father of the date and time of the court hearing concerning the children. The OFC placed the children with their maternal grandmother and step-grandfather.

On June 7, 2002, the OFC filed separate petitions alleging C.R. and A.R. to be children in need of services ("CHINS"), and an initial hearing was held. Father did not appear at the hearing.[5] Father did, however, appear in person at a hearing on June 19, 2002, at which he admitted to the allegations in the CHINS petitions. At that hearing, the court granted Father supervised visitation with C.R. and A.R.

Shortly thereafter, on August 26, 2002, Father was arrested and charged under Cause No. 82C01–0208–FB–910 with dealing in methamphetamine and possession of precursors with intent to manufacture methamphetamine. On November 26, 2002, Father pleaded guilty under Cause No. 405 to possession of methamphetamine as a Class D felony and was sentenced to three years incarceration.[6] Father also pleaded guilty to the possession charge under Cause No. 910 and was sentenced, on December 16, 2002, to three years in-

carceration, to be served consecutive to the sentence imposed under Cause No. 405. Father was incarcerated from the time of his August 26 arrest until June 2005.

On October 22, 2003, the OFC filed under separate causes verified petitions to terminate Father's parental rights to C.R. and A.R. Following a couple of status hearings, the dispositional hearing on the petitions was originally set for January 25, 2005. Apparently upon Father's motion, the January dispositional hearing date was subsequently vacated, but the parties appeared at the scheduled time for a pre-trial hearing. At that hearing, Father's counsel informed the court that Father would be released from prison in June 2005 and requested that the dispositional hearing be reset for some time after his release. The court denied Father's request and reset the trial for April 12, 2005, six weeks prior to Father's release. On February 28, 2005, Father filed a motion for continuance of the April 12 hearing date, which the court denied following a hearing on March 16, 2005. The dispositional hearing on the petitions to terminate Father's parental rights was held as scheduled on April 12, 2005. The trial court entered orders terminating Father's parental rights to C.R. and A.R. on April 21, 2005. After filing a notice of appeal under both causes, Father filed a motion to consolidate the appeals, which this court granted.

Upon appeal, Father argues that the trial court abused its discretion in denying

4. On April 5, 2002, Father was arrested and charged under Cause No. 82C01–0204–FB–405 with dealing in cocaine or narcotic drug, possession of a narcotic drug, possession of precursors with intent to manufacture methamphetamine, and maintaining a common nuisance. At the time C.R. and A.R. were taken into custody, Father was out on bond awaiting trial upon the above charges.

5. Father later explained to the OFC investigator that he did not appear for the hearing because, according to him, he was told that he did not have any rights because he had not established paternity. Father further informed her that since that hearing, he had established his paternity as to C.R. and A.R.

6. This is the cause referred to in footnote 4, *supra*.

his motion for continuance of the dispositional hearing date on the petition to terminate his parental rights. In support of his motion for continuance, Father asserted that because he was incarcerated he was unable to assist his attorney in preparing his case. Father further asserted that he would be released from prison in June 2005, just six weeks after the scheduled dispositional hearing on the termination of his parental rights. Father explained that he wanted an opportunity to become established in the community and to participate in services directed at reunifying him with C.R. and A.R. The OFC opposed Father's motion for continuance, asserting that the children had been under the supervision of the OFC for over two years and that the children would benefit from the permanent placement by way of adoption by the maternal grandmother.

The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court. *Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 311 (Ind.Ct.App.2000). We will reverse the trial court only for an abuse of that discretion. *Id.* An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion. *Id.* However, no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial. *Id.*

Here, we conclude that Father showed good cause for granting his motion to continue the dispositional hearing—an opportunity for him to participate in services offered by the OFC directed at reunifying him with his children upon his release from prison. We acknowledge that Father requested a continuance because he would still have been incarcerated on the date of the scheduled hearing and recognize that such incarceration was by his

own doing. Nevertheless, Father was set to be released only six weeks after the scheduled dispositional hearing. Further, Father has demonstrated prejudice by the denial of his motion for continuance in that his ability to care for his children was assessed as of the date of the hearing he sought to have continued. At that time, Father was incarcerated and had not had the opportunity to participate in services offered by the OFC or to demonstrate his fitness as a parent. The result was that his parental rights were forever and unalterably terminated. This result is particularly harsh where Father, while incarcerated, participated in numerous services and programs, although offered by the correctional facility and not the OFC, which would be helpful to him in reaching his goal of reunification with his children.

In deference to the trial court and the OFC, we recognize the compulsion to proceed with termination of Father's parental rights, which is likely brought about by Indiana's statutory response to the federal requirements and time constraints of the Adoption Assistance and Welfare Act. The purpose behind the time constraints is to "ensure that children [do] not spend long periods of their childhoods in foster care or other settings designed to be temporary." *Phelps v. Sybinsky*, 736 N.E.2d 809, 813 (Ind.Ct.App.2000), *trans. denied.* Here, however, the children have been in the care and custody of their maternal grandmother since they were determined to be CHINS nearly three years prior to the dispositional hearing Father sought to continue. The OFC's plan for the children was that they would be adopted by the maternal grandmother. Thus, continuation of the dispositional hearing until sometime after Father was released would have had little immediate effect upon the children. We conclude that under these circumstances, the trial court abused its

discretion in denying Father's motion for continuance. The trial court should have granted Father's continuance and reset the dispositional hearing after Father was given a sufficient period following his release to demonstrate his willingness and ability to assume parental duties.

Father also argues that the OFC did not prove the statutory factors required to terminate his parental rights by clear and convincing evidence. This court has long had a highly deferential standard of review in cases concerning termination of parental rights. Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind.Ct.App.2001). We will not set aside the trial court's judgment terminating parental rights unless it is clearly erroneous. *Id.* We neither reweigh evidence nor judge witness credibility, and we consider only the evidence most favorable to the judgment along with reasonable inferences to be drawn therefrom. *Id.*

To involuntarily terminate a parent-child relationship, the OFC must establish the following elements:

"(A) . . .

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

* * *

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child." Ind. Code § 31–35–2–4(b)(2) (Burns Code Ed. Repl.2003).

These elements must be proved by clear and convincing evidence. Ind.Code § 31–34–12–2 (Burns Code Ed. Repl.2003). When evaluating the circumstances surrounding the termination of a parent-child relationship, the court should subordinate the parent's interests to those of the children. *In re N.B.*, 731 N.E.2d 492, 494 (Ind.Ct.App.2000), *trans. denied.* The trial court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* In determining whether the conditions that led to the children's removal are likely to be remedied, the trial court must assess the parent's ability to care for the children as of the date of the termination proceeding and take into account any evidence of changed conditions. *K.S.*, 750 N.E.2d at 837. However, the trial court should also take into account the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior, as well as the services offered by the OFC to the parent and the parent's response to those services. *Id.*

In support of termination of Father's parental rights, the OFC presented evidence demonstrating Father's criminal history, substance abuse, unstable housing, unstable employment history, and neglect of his children, most of which occurred prior to the CHINS determinations. With regard to his criminal history, the OFC presented evidence of Father's pattern of criminal behavior which began when Fa-

ther was a juvenile and continued until his arrest in August 2002.[7]

The OFC also presented evidence of Father's history of substance abuse. Father did not deny his substance abuse problems and indeed testified that he was an alcoholic and that he began drinking in 1989 after his mother passed away. Father further testified that he began using methamphetamine in 2000 and that his drug use "got extremely bad real quick" going from smoking methamphetamine to intravenous drug use. Transcript at 218. Father admitted that he used methamphetamine until he was arrested in 2002. Father testified that he had not used drugs since he was incarcerated.

As to living conditions, the OFC presented evidence that while Father and Mother lived together from 1998 until sometime in 2001, they were transient, moving between relatives' homes, apartments, and motels. When Father and Mother maintained housing of their own, they lived in filth and squalor. The children were exposed to dangerous conditions such as drug-filled syringes and drug paraphernalia lying around the house and noxious gases from Father's manufacture of methamphetamine in the home. The OFC also presented evidence that Father and Mother failed to provide proper medical attention to the children, including failing

to obtain their necessary immunizations. On several occasions, the children were found wandering around outside unsupervised.

Based upon Father's habitual patterns of conduct prior to his most recent incarceration, including his long history of substance abuse, criminal and drug-related activity, his transient lifestyle, his lack of employment history, as well as past neglect and lack of parenting skills, the OFC argued that there was a reasonable probability that the issues which resulted in the children's removal and continued placement outside the home would continue. The OFC also asserted that it was in C.R. and A.R.'s best interests to be placed in a permanent home with the plan being for the maternal grandmother and step-grandfather to adopt them.[8]

As noted above, a parent's habitual patterns of conduct may be used by the trial court as a means of determining the probability of future detrimental behavior. However, the court must assess the parent's ability to care for the children as of the date of the termination hearing. *K.S.,* 750 N.E.2d at 837. The OFC's evidence, while evincing a habitual pattern of conduct by Father prior to his latest incarceration, does not accurately reflect Father's status and ability to care for his children as of the time of the termination hearing.

7. Father's criminal history follows: in 1995, at the age of nineteen, Father was convicted of residential entry, battery and forgery, and subsequently sentenced to an aggregate term of four years incarceration. Father was released on parole in 1997. In 1999, Father was returned to prison for six months for violating his parole. In 2001, Father was arrested for criminal trespass and theft of anhydrous ammonia and sentenced to eighteen months, of which he served four, in the Posey County jail. Shortly after his release, and while Father was on probation, Father was arrested and charged with dealing in cocaine or narcotic drug, possession of a nar-

cotic drug, possession of precursors with intent to manufacture methamphetamine, and maintaining a common nuisance (Cause No. 405). On August 26, 2002, while out on bond awaiting trial on those charges, Father was arrested and charged with dealing in methamphetamine and possession of precursors with intent to manufacture methamphetamine (Cause No. 910).

8. We note that Mother voluntarily relinquished her parental rights as to C.R. and A.R. and supported their adoption by her mother and step-father.

Here, Father was incarcerated throughout the entire termination proceedings and for all but two months of the CHINS proceedings. At the time of the termination hearing, Father was incarcerated, but he was set to be released six weeks after the hearing.

Because of Father's incarceration, the OFC did not communicate with Father throughout the CHINS or termination proceedings concerning his reunification with his children. Further, the OFC did not, nor was it required to, provide Father with services directed at reuniting him with his children. Nevertheless, while incarcerated Father took steps and made a good-faith effort to better himself as a person and as a parent. To be sure, the record reveals that while incarcerated at the New Castle Correctional Facility, Father was placed in a Therapeutic Community.[9] As of two weeks prior to the termination hearing, Father had participated in nearly 1,100 hours of individual and group services, including services in encounters, anger management and impulse control, parenting skills, domestic violence, self-esteem, self-help, and substance abuse. Father had also earned twelve hours of college credit through Ball State University, maintaining a 2.33 grade point average, and at the time of the termination hearing was enrolled in an additional eighteen hours.

At the termination hearing, Father admitted to his criminal history and prior drug use, stating that "I never wanna use drugs again. It's ruined my life. It's ruined everything about me." Transcript at 219. Father testified that he benefited greatly from the services he received in the Therapeutic Community and further testified that he intended to continue to take positive steps once he is released from prison with the hope of being reunited with his children. Toward that goal, Father testified he had not used drugs while incarcerated and that once released he planned to continue counseling and other services to help him maintain sobriety. Father also testified that he had secured employment doing general construction work for after his release and that he planned to live with his aunt.[10] In addition to obtaining employment, Father testified that he had been accepted at the University of Evansville and planned to take courses in general studies beginning in August. Given the positive strides Father has made toward turning his life around, we conclude that the OFC did not present clear and convincing evidence that there is a reasonable probability that the conditions which resulted in the children's removal would not be remedied.

Further, we conclude that the record does not support a finding that termination at this point in time is in the best interests of the children. Indeed, the record demonstrates that Father has maintained a relationship with his children while incarcerated. Father sent C.R. and A.R. letters, and they sent him pictures which they had drawn. Father also communicated with the children through telephone calls. When he would call, the children were happy to talk to him, telling him that they loved him and asking when he was coming home.

9. In a letter submitted to the trial court, Father's primary counselor described the Therapeutic Community as a "24–hour–a–day/seven–day–a–week treatment experience." Appendix at 65. He further noted that "research has repeatedly shown that people who stay in a [Therapeutic Community] for an extended period of time increase their likelihood of staying clean, crime-free, and out of the system." Appendix at 65.

10. The record reveals that C.R. and A.R. would spend weekends with Father's aunt.

■ The OFC also argues that termination of Father's rights is in the best interests of the children because only then can they be adopted by the maternal grandmother and step-grandfather and be given a permanent home. We acknowledge that in the matter of raising children, stability of environment is an important factor. However, this in and of itself is not a valid basis for terminating the relationship between the natural parent and the children. Here, upon their removal from Mother's care in June 2002, the children were immediately placed in the care and custody of the maternal grandmother and step-grandfather and have remained there throughout the proceedings. At the time of the dispositional hearing, the children had been in the care of the maternal grandmother for nearly three years, and the evidence presented at the hearing demonstrates that the children are thriving under the arrangement.

Under such circumstances, however, where the children have been in the maternal grandmother's care for nearly three years and where the plans are that upon termination of Father's rights, they will continue under her care, we see little harm in extending the CHINS wardship until such time as Father has a chance to prove himself a fit parent for the children. This is not a case where the children are in a temporary arrangement pending termination of parental rights. Rather, in this case, continuation of the CHINS wardship will have little, if any, impact upon them.

■ The law makes abundantly clear that termination of a parent's relationship with a child is an extreme measure to be used only as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind.Ct.App.2004); *M.H.C. v. Hill,* 750 N.E.2d 872, 875 (Ind.

Ct.App.2001). Given the circumstances before us, we do not believe that the situation before us has reached the "last resort" stage. We readily acknowledge that there is no guarantee that Father, following his release from prison, would prove himself to be an exemplary parent. The law, however, does not require such guarantees before a parent may attempt to demonstrate the desire and ability to achieve a meaningful reunification with his children. Here, Father, at the very least, was entitled to that opportunity to maintain a relationship deemed in fact and in law to be so undeniably important. *M.L.B. v. S.L.J.,* 519 U.S. 102, 116–17, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).

While we acknowledge Father's troubled past and his failings as a parent, we also recognize the positive steps Father has taken to turn his life around for the sake of himself and his children. This is not to say that Father was, at the time of the disposition hearing, ready and able to undertake full care of C.R. and A.R. Indeed, Father himself testified that upon his release he would not be ready to take on the full responsibility of C.R. and A.R. Father simply wanted a chance to establish himself in the community and to participate in services offered by the OFC to make him a better person and parent for C.R. and A.R.

In this case, termination of parental rights seems particularly harsh given that Father has shown a great interest in maintaining a parental relationship and has taken strides toward that end and is more than willing to continue to participate in parenting and personal improvement programs and services. Given the positive strides Father made while incarcerated, we conclude that the OFC did not establish by clear and convincing evidence that the conditions which resulted in the removal of the children would not be remedied or

that at this point in time, termination was in the best interests of the children.

The judgment of the trial court is reversed, and the cause is remanded for further proceedings under the CHINS order.

DARDEN, J., concurs.

KIRSCH. C.J., dissents without opinion.