# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 13 2017, 10:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Sean P. Hilgendorf
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Marjorie Newell
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| M.B., <br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br> *Appellee-Petitioner* | March 13, 2017 <br><br> Court of Appeals Case No. 71A03-1606-JT-1455 <br><br> Appeal from the St. Joseph Probate Court <br><br> The Honorable James N. Fox, Judge <br><br> Trial Court Cause No. 71J01-1501-JT-9 |

**Altice, Judge.**

## Case Summary

[1]     M.B. (Father) appeals the involuntary termination of his parental rights to his son, M.H. (Child). He raises two issues on appeal:

1. Did the trial court abuse its discretion by denying Father's oral motion for a continuance made at the beginning of the final hearing?

2. Did the trial court erroneously conclude that continuation of the parent-child relationship between Father and Child posed a threat to Child's well-being?

[2]     We affirm.

## Facts & Procedural History[1]

[3]     Child was born to C.H. (Mother) and Father in September 2007, and lived in Indiana with Mother following his birth. Father, who lives in Michigan, visited Child once or twice a week for about four months following Child's birth. Visits became more sporadic thereafter until the Indiana Department of Child Services (DCS) became involved when Child was about two years old. Father visited twice a week with Child at that point for about six months, and then visits again became sporadic.

---

[1] Mother does not challenge the termination of her parental rights. Accordingly, we will focus on only those facts related to Father.

[4] Shortly after Child turned six years old, DCS once again became involved with the family due to Mother's mental health issues and Child's behavior. Mother and DCS entered into an informal adjustment agreement in early December 2013, which "ended very promptly unsuccessfully". *December 10, 2015 Transcript* at 29. DCS determined that Child's safety was in jeopardy and removed him from Mother's home on or about December 17, 2013. Around this same time, DCS family case manager (FCM) Bridget Murray discussed the possibility of placement with Father. He refused to take Child, indicating that he lived in Michigan and was a registered sex offender. Father also indicated that he would not consider moving to Indiana so he could care for Child. He suggested that Child be placed with Child's half-sister, P.H. Child was placed in P.H.'s care on December 27, 2013, where he has remained.

[5] CHINS proceedings commenced, and on January 9, 2014, Father admitted that Child was a CHINS. Child was adjudicated a CHINS as to Mother also on April 2, 2014, and a parental participation order and dispositional decree followed on May 7, 2014. Among other things, Father was ordered to keep all appointments, complete a parenting assessment and successfully complete all recommendations developed as a result of the assessment, and attend all scheduled visitations with Child.

[6] Father did not complete the required parenting assessment until August 11, 2014, which was three months after the referral. The delay was the result of Father cancelling the May appointment and not rescheduling. Father

completed the parenting assessment only after being found noncompliant by the trial court at the progress hearing on August 6, 2014.

[7] As a result of the parenting assessment, Father was directed to participate in family and individual therapy, obtain a medical evaluation, and attend supervised visits with Child. Thereafter, Father never had a medical evaluation and did not seek individual therapy until July 2015, despite being referred nine months earlier. He attended only three sessions and then was referred, on September 4, 2015, for a psychological evaluation. Father delayed once again and did not complete the psychological evaluation until November 20, 2015.

[8] Father never maintained consistency with visitation. As of the August 2014 review hearing, Father had not seen Child since May 17, 2014, and had only visited with him five times since Child's removal in December 2013. After going a few months without visiting Child, he began visiting again in August 2014. However, visits continued to be sporadic, as he regularly cancelled or was a no show. This had a negative effect on Child, especially with Child's diagnosed PTSD. As a result, the trial court suspended Father's visits with Child on October 8, 2014. Father last saw Child in September 2014.

[9] At the December 17, 2014 permanency hearing, the court changed Child's permanency plan to concurrent plans of adoption and reunification. Thereafter, DCS filed the instant termination petition. The final termination hearing was originally scheduled for July 30, 2015, but was continued on Father's motion. On July 15, 2015, the trial court rescheduled the final hearing for December 10

and 14, 2015. At the start of the final hearing, Father orally moved for another continuance, which the trial court denied.

[10] At the final hearing, FCM Deborah Banghart testified in detail regarding Father's persistent noncompliance with services. She explained that his pattern was typically to reinitiate or start services just before a scheduled hearing and then become noncompliant again. Further, FCM Banghart opined that it was in Child's best interests for Mother's and Father's parental rights to be terminated. Similarly, the CASA for Child testified that termination and adoption by P.H. was in Child's best interests.

[11] P.H. testified that she wished to adopt Child, and Child's therapist, among others, testified that this was what Child wanted too. By all accounts, Child has thrived in P.H.'s care. Although P.H. indicated that Child enjoyed his visits with Father, she explained that Father missed at least half of the scheduled visits. She also noted that Father has always talked about her keeping Child and has "never seemed to want him". *December 14, 2015 Transcript* at 51. Indeed, throughout the CHINS and termination proceedings, Father never sought custody of Child. In his proposed order, Father made clear that he only sought "a continued relationship with [Child], while [P.H.] retains custody." *Appellant's Appendix* at 43.

[12] On April 22, 2016, the trial court issued its order terminating Mother and Father's parental rights. DCS filed a motion to correct error, which resulted in the trial court issuing a corrected termination order on May 26, 2016. Father

appeals the termination of his parental rights.  Additional facts will be provided below as needed.

## Discussion & Decision

### 1.  Denial of Continuance

Father contends that the trial court abused its discretion by denying his oral request for a second continuance made at the start of the final hearing.  We review the denial of a motion for a continuance for an abuse of discretion. *Parmeter v. Cass Cty. Dep't of Child Servs.*, 878 N.E.2d 444, 449 (Ind. Ct. App. 2007).  We will not disturb a trial court's denial of a continuance "absent a showing of clear and prejudicial abuse of discretion." *Id*.  On appeal, Father must establish good cause for the granting of his motion and prejudice resulting from its denial.  *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006).

On December 10, 2015, counsel for Father explained to the trial court the basis for the motion for continuance:

> [Father], we met about a week ago.  I think he was not too certain when the date was.  He thought it was later in December that our hearing was.  He appeared with a lot of material.  A lot of this we haven't sat down and reviewed and the exhibits that I think he has, witnesses that maybe we haven't talked about and I think this date sort of snuck up on him, but of more importance, because the Court can certainly say that's our fault, but there was a report by Dr. Sibilla that was ordered in the CHINS case for a psychological evaluation.  That was done in November.  We received that report this week and [Father] hadn't had a chance

to actually meet with me to review it himself. I've read it to him over the phone, parts of it. He's actually reading it now and his question to me at 4:15 was don't I have a right to hire my own psychologist if I disagree with their report, to hire my own doctor to do an evaluation and submit that as evidence, and I said, yes …, so I think more than the fact that we haven't met as much as we ought to meet and review his witnesses and such, I think this evaluation which apparently is going to be offered by Dr. Sibilla and I think my client certainly now that he's just got the report this week certainly has the right to hire a doctor of his own choosing to do an evaluation that we can submit.

*December 10, 2015 Transcript* at 12-13.

[15] The record establishes that the final hearing dates had been set for nearly five months, giving Father ample time to meet with his attorney and gather evidence. Moreover, the delay in obtaining Dr. Sibilla's report was directly due to Father's noncompliance. He was referred to Dr. Sibilla for a diagnostic psychological parenting evaluation on September 4, 2015. Father, however, cut his initial appointment short and then did not show up for the rescheduled appointment. As a result, Father did not finish his clinical interview with Dr. Sibilla until November 20. Dr. Sibilla completed his written report and sent it to DCS at the end of November. DCS then promptly emailed the report to Father's counsel on December 3, which was one week before the final hearing. Father then waited until the day of trial to move for a continuance. Under the circumstances, we cannot say that the trial court abused its discretion by denying Father's motion.

Moreover, Father has failed to establish that he was prejudiced by the denial of his motion for continuance. Dr. Sibilla's report was not particularly remarkable, and the trial court did not expressly rely on the report or Dr. Sibilla's testimony in the termination order. The focus of DCS's case against Father and the trial court's order was Father's consistent noncompliance with services and lack of visitation with Child.

## 2. Sufficiency

Father argues that DCS failed to present sufficient evidence to support the termination of his parental rights. He asserts that the evidence merely established that he "had some difficulty fully complying with some visitations with the child and fully complying with some appointments with doctors and DCS workers." *Appellant's Brief* at 7. He challenges only the trial court's finding that continuation of the relationship between Father and Child would pose a threat to Child's well-being.

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[19] Father challenges the trial court's findings only as to the threat the relationship posed to Child's well-being. We note, however, that I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive and only one of the three requirements must be established by clear and convincing evidence. Here, the trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal, including continued placement outside Father's care, will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). Standing alone, the unchallenged finding regarding the likelihood that conditions would not change satisfies the requirement listed in subsection (B).

[20] Moreover, Father's brief challenge to the threat finding is simply a request for us to reweigh the evidence regarding the degree of his noncompliance. In sum, Father argues that the evidence showed only that he "perhaps had some issues" and that he "did not exercise all of his visitations" due to "transportation

issues." *Appellant's Brief* at 10. He notes that he had a parenting assessment and participated in individual therapy sessions.

[21] On review, we will not reweigh the evidence or judge the credibility of witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Rather, we will consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Accordingly, we reject Father's blatant request for us to reweigh the evidence.

[22] The evidence establishes that during the two years following Child's removal, Father rarely visited Child and regularly failed to comply with service providers, timely follow up on referrals, or follow the trial court's orders. The pattern he established was to do the bare minimum immediately before a scheduled hearing.[2] Further, at no time did Father seek custody of Child or offer the stability Child had so obviously not been receiving from Mother. His preference was for P.H. to continue raising Child and for him to be able to visit Child. FCM Banghart opined, however, that a continued relationship between Father and Child would pose a threat to Child's well-being given Father's complete lack of follow through and consistency, which exacerbates Child's PTSD symptoms. In sum, we conclude that Father has failed to establish that the trial court's threat finding was erroneous.

---

[2] For example, Father was referred for individual therapy on October 1, 2014, but he did not attend his first session until nine months later. He attended a matter of weeks before the then-scheduled final termination hearing in July 2015.

[23] Judgment affirmed.

[24] Riley, J. and Crone, J., concur.