## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 18 2018, 10:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle K. Dugger
Monroe County Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.S. (Minor Child)

and

X.S. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

April 18, 2018

Court of Appeals Case No.
53A01-1710-JT-2340

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Trial Court Cause No.
53C07-1607-JT-472

**Vaidik, Chief Judge.**

# Case Summary

X.S. ("Father") appeals the termination of his parental rights to his daughter, arguing that the trial court should have granted his motion to continue the termination hearing. We agree and remand for further proceedings.

# Facts and Procedural History

This is an appeal from the termination of Father's parental rights by Monroe Circuit Court 7, but the case revolves around Father's history of drug-related criminal charges in Monroe Circuit Court 2. In 2007, Father was charged with Class B felony possession of cocaine ("Case 1186"). He pled guilty and was sentenced to twenty years with ten years suspended. He was released to probation in March 2012. Two years later, in April 2014, Father was charged with Class D felony possession of cocaine, Class D felony strangulation, and Class A misdemeanor domestic battery ("Case 468"). At the same time, the State petitioned to revoke Father's probation in Case 1186. Father pled guilty as charged in Case 468 and was sentenced to one year in Community Corrections, to be served on home detention. The court also ordered Father to serve one year of his suspended sentence in Case 1186 on home detention, running consecutive to the sentence in Case 468, for a total of two years on home detention.

On December 9, 2014, while Father was serving his home-detention sentence, his daughter, A.S., was born. At birth, A.S. exhibited drug-withdrawal

symptoms, so hospital staff ran a drug screen, which came back positive for cocaine. The Department of Child Services (DCS) was contacted and began working with Father and A.S.'s mother.[1] DCS offered the parents substance-abuse treatment through its Sobriety Treatment and Recovery Team (START) program. Both parents, however, continued to use illegal drugs and failed drug screens. On December 22, two weeks after A.S. was born, DCS removed her from the home. The next day, DCS filed a child in need of services (CHINS) petition in Circuit Court 7.

[4]     One week after A.S. was removed from the home, Father was arrested for violating the terms of his home detention in Case 468. However, Circuit Court 2 allowed him to continue serving his sentence on home detention. In January 2015, Father voluntarily completed a substance-abuse evaluation, and it was recommended that he begin intensive outpatient treatment (IOP). On February 12, a hearing was held on the CHINS petition, Father admitted to the allegations, and A.S. was adjudicated a CHINS. A dispositional hearing was scheduled for March 9. Before that hearing, Father voluntarily began IOP. After the dispositional hearing, the court ordered Father to participate in services with DCS, including individual therapy, IOP, and supervised visits with A.S.

---

[1] A.S.'s mother consented to A.S. being adopted and is not a party to this appeal. Accordingly, we discuss only the facts relevant to Father's appeal.

[5] DCS was in the process of setting up services for Father when, on April 27, he was arrested and charged with three counts of dealing in cocaine, a Level 5 felony ("Case 397"). The charges were pending for fifteen months, and the record includes very little information regarding what transpired in the CHINS case over this time. We only know that Father remained incarcerated at the Monroe County Jail, that he exercised visits with A.S. every sixty days, and that he completed eight sections of a cognitive-skills workbook that focused on cognition mapping, traditional versus criminal values, relationships, personal inventories, boundaries, and anger management. Tr. Vol. II p. 39.

[6] In July 2016, Father pled guilty to one count of dealing in cocaine in Case 397. Circuit Court 2 sentenced Father to four years in the Department of Correction (DOC) and also ordered him to serve the remainder of his suspended sentence in Case 1186—nine years—consecutive to his sentence in Case 397, for a total of thirteen years. The State recommended Father for Purposeful Incarceration, which is a nine-to-eleven-month program for "chemically addicted offenders" whose addictions "are directly related to their criminal behavior." *Purposeful Incarceration*, www.in.gov/idoc/2798.htm. The program combines group and individual counseling to address substance-abuse recovery, rational thinking, criminal lifestyles, dysfunctional families, work stress, anger management, and relapse prevention. Tr. Vol. II pp. 40-41. The court followed the State's recommendation, referred Father to Purposeful Incarceration, and stated that it would "modify Defendant's sentence if he successfully complete[d] Purposeful Incarceration." Father's Ex. 1.

[7]     Less than a week after Father was sentenced in his criminal cases, DCS petitioned to terminate his parental rights in Circuit Court 7. A termination hearing was scheduled for March 27, 2017. Ten days before that hearing, DCS moved to continue, and the hearing was reset for April 24. On April 24, DCS sought another continuance, and the court rescheduled the hearing for July 6. The trial court, on its own motion, continued the hearing until July 31. On July 10, Father moved to continue because of DCS's failure to meet discovery deadlines, and DCS joined his motion. The hearing was once again rescheduled, this time for September 5. Father sought another continuance on August 24, stating that he would graduate from Purposeful Incarceration on September 29 and that the criminal court had guaranteed him a sentence modification upon graduation. He asked that the hearing be scheduled after he completed Purposeful Incarceration. The trial court denied Father's motion, and the termination hearing was held on September 5.

[8]     The morning of the hearing, Father renewed his motion to continue, but his request was denied. Father attended the hearing telephonically because in-person attendance "could cause a delay in graduating from" Purposeful Incarceration. Tr. Vol. II p. 4. Father testified that he expected to be released from prison by the end of 2017 based on his completion of Purposeful Incarceration. Father believed he would be released to a transitional housing program and that he would be re-hired by his former employer. Regarding A.S., Father continued to have supervised visits with her every sixty days in prison and had not missed a visit. They ate together, read, and played. At the

visit before the termination hearing, A.S. waved goodbye to Father and blew him a kiss.

[9] Family Case Manager (FCM) Branan Neeley stressed that Father's release date was still listed as 2022 and that he had an "extensive criminal history" involving cocaine. *Id.* at 36. FCM Neeley stated that Father had not participated in any services with DCS because he had been incarcerated since April 2015. At the time of the arrest, DCS was working on getting Father's services in place, but it had not made any referrals for him. *See id.* at 33. However, FCM Neeley acknowledged that Father had completed eight sections of the cognitive-skills workbook while in jail and was about to graduate from Purposeful Incarceration.

[10] FCM Neeley emphasized that Purposeful Incarceration does not specifically address parenting skills. However, when asked about Father's parenting skills, FCM Neeley said that he had never observed Father with A.S. He admitted that all of the reports he had received about Father's parenting were positive: Father asks A.S. age-appropriate questions, asks DCS case workers about A.S.'s development and routine, and is attuned to A.S.'s needs during visits. FCM Neeley said, "[T]here [have] never been any concerns about his appropriateness with [A.S.], his discussions with her, um and that kind of stuff." *Id.* at 42. FCM Neeley also acknowledged that A.S. is affectionate toward Father during their visits, sitting in his lap while he reads to her.

Throughout the duration of the CHINS and termination proceedings, A.S. has been placed with the same foster-care family. The home was pre-adoptive and DCS's plan was for A.S. to be adopted by the family should Father's parental rights be terminated. After the hearing, the trial court entered findings of fact and conclusions and terminated Father's parental rights to A.S.

Father now appeals.

# Discussion and Decision

Father raises two issues on appeal. First, he claims that the trial court should have granted his motion to continue. Second, he argues that the evidence is insufficient to support the termination of his parental rights. Because we agree with Father that the trial court should have granted his continuance, we do not address his second argument or take a position on the merits of the decision to terminate his parental rights.

Generally, the decision to grant or deny a motion to continue is within the sound discretion of the trial court, and we will reverse only for an abuse of discretion. *In re J.E.*, 45 N.E.3d 1243, 1246 (Ind. Ct. App. 2015), *trans. denied*. An abuse of discretion occurs when the trial court's conclusion is clearly against the logic and effect of the facts and circumstances before the court or the reasonable and probable deductions to be drawn therefrom. *Id.* When a motion to continue has been denied, an abuse of discretion will be found if the moving party has demonstrated good cause for granting the motion, but we will

reverse the trial court's decision only if the moving party can show that he was prejudiced by the denial. *Id.*

[15] Father analogizes his situation to that of the father in *Rowlett v. Vanderburgh County Office of Family and Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*. In *Rowlett*, the father was arrested and charged with dealing in methamphetamine two months after his children were adjudicated CHINS. The father was unable to participate in services with the Office of Family and Children (OFC) because of his incarceration, but he participated in "nearly 1,100 hours of individual and group services" directed at reunification with his children. 841 N.E.2d at 622. The OFC petitioned to terminate the father's parental rights while he was incarcerated. At a pre-trial conference in January 2005, the father informed the court that he would be released in June 2005 and asked that the termination hearing be set after his release. The court denied his request and set the hearing for April 2005, approximately six weeks before the father's release date. The father's parental rights were terminated.

[16] The father appealed and claimed that the trial court abused its discretion when it denied his motion for continuance. He argued that he should have been given the opportunity to engage in reunification services and establish himself within his community. The OFC, on the other hand, stated that the children had been removed from the father for over two years and needed permanency. The children had been placed with their maternal grandmother for the duration of the CHINS and termination proceedings, and the OFC's plan was for her to adopt the children if the father's rights were terminated.

[17]    This Court held that good cause for granting the father's continuance existed because it would have granted him an opportunity to "participate in services offered by the OFC directed at reunifying him with his children upon his release from prison." *Id.* at 619. The OFC would have to wait only six weeks for the father to be released. We also held that the father was prejudiced by the decision because the trial court assessed his ability to care for his children "as of the date of the hearing he sought to have continued." *Id.* We went on to say that termination was "particularly harsh where Father, while incarcerated, participated in numerous services and programs . . . which would be helpful to him in reaching his goal of reunification with his children." *Id.* Because the OFC's plan was for the children to be adopted by the maternal grandmother and they had been in her care since removal, we concluded that continuation of the termination hearing "would have little immediate effect upon the children." *Id.* We ultimately concluded that the trial court abused its discretion in denying the father's motion for continuance and that the hearing should have been reset "after Father was given a sufficient period following his release to demonstrate his willingness and ability to assume parental duties." *Id.* at 620.

[18]    We agree that Father is situated similarly to the father in *Rowlett*. First, like the father in *Rowlett*, Father was on the verge of significant, favorable change in his incarceration status. He was twenty-four days shy of graduating from Purposeful Incarceration, which would result in a guaranteed sentence modification. Second, any additional delay in the termination proceedings would not negatively impact A.S. Similar to the children in *Rowlett*, A.S. has

been in the same foster home since her removal, and DCS's plan was for her foster parents to adopt her if Father's parental rights were terminated. A.S. was also bonded with Father and was affectionate toward him, sitting in his lap when he read to her and blowing him kisses and waving goodbye. For these reasons, we conclude that good cause existed at the time of Father's motion and that the trial court should have continued the case at least long enough to see if Father graduated from Purposeful Incarceration and, if so, the extent to which Circuit Court 2 modified his sentence.

[19] Father has also shown that he was prejudiced by the denial of his motion. The denial allowed DCS to argue repeatedly, and the court to find, that Father would not be released from prison until 2022, even though everyone involved knew that there was a very good chance that Father would be released much sooner. Like the father in *Rowlett*, Father was judged as an incarcerated parent, rather than as a parent whose incarceration status was about to change. *See id.* at 619.

[20] DCS contends that *Rowlett* is distinguishable from this case for two reasons. First, it claims that "unlike in *Rowlett*, Father had the opportunity to participate in reunification services. Instead, Father chose criminal activity over the opportunity to engage in reunification services and parent [A.S.]." Appellee's Br. p. 16 (citations omitted). But Father had no more of an opportunity to engage in reunification services than the father in *Rowlett*. Both Father and the father in *Rowlett* were arrested two months after their CHINS adjudication hearings and remained incarcerated for the duration of their CHINS and

termination proceedings. As we did in *Rowlett*, we credit Father for the efforts he has taken while incarcerated to better himself and reunify with A.S.; he completed multiple sections of a cognitive-skills workbook and was about to graduate from Purposeful Incarceration. DCS's argument is also flawed because Father **did** voluntarily engage in services before his arrest. Specifically, he completed a substance-abuse evaluation and began IOP. To the extent that he did not participate in additional services, FCM Neeley testified that, at the time of Father's April 2015 arrest, DCS had not yet set up any services for Father.

[21] DCS also emphasizes that the father in *Rowlett* had an imminent release date when his termination hearing was held, whereas Father's release date was approximately five years away. DCS acknowledges that Father would "**likely** receive a sentencing modification for completing Purposeful Incarceration" but contends that the extent of the modification was uncertain. *Id.* at 15 (emphasis added). Initially, we note that the modification of Father's sentence wasn't just "likely"; it had already been promised should Father graduate from Purposeful Incarceration. Circuit Court 2 explicitly "agree[d] to modify Defendant's sentence if he successfully complete[d] Purposeful Incarceration." Father's Ex. 1. And while we acknowledge that the extent of the expected modification was unknown, we do not find the distinction to be dispositive. Even though Father's anticipated release date was 2022 at the time of the hearing, it is undisputed that he was on track to graduate from Purposeful Incarceration in less than one month and that he would then receive a potentially significant

modification of his sentence. Because of this, Circuit Court 7 should have continued the case long enough to see if Father completed Purposeful Incarceration and, if so, the extent of the sentence modification granted by Circuit Court 2. If the modification made Father's release date imminent, a *Rowlett*-style continuance would have been in order, giving Father the opportunity to engage with DCS and demonstrate his willingness and ability to parent A.S.[2] For the foregoing reasons, we reverse the termination of Father's parental rights and remand for further proceedings.

Reversed and remanded.

May, J., and Altice, J., concur.

---

[2] A review of the dockets in Case 397 and Case 1186 shows that Father did graduate from Purposeful Incarceration and that his sentence was modified. On October 10, 2017—thirty-five days after Father's continuance was denied—the DOC submitted a "Progress Report, Treatment Summary, and Release Recovery Plan" to Circuit Court 2. A sentence-modification hearing was held, and on December 6, the court found Father was eligible for Re-Entry Court and referred him to that program. The Re-Entry Court accepted Father's case and ordered that Father was to be released from prison, that he was to participate in the Community Transition Program, and that the remaining sentences in Cases 397 and 1186 be stayed. Father was released from prison on January 22, 2018. Father is expected to be released from the Community Transition Program on May 21, 2018, and is to continue participating in Re-Entry Court until January 2020.