# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 30 2019, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent–Child Relationship of: J.R., J.B., & T.R. (Minor Children) <br><br> and <br><br> S.R. (Mother),[1] <br><br> *Appellant-Respondent,* <br><br> *v.* <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | May 30, 2019 <br><br> Court of Appeals Case No. 18A-JT-3071 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Hon. Faith A. Graham, Judge <br><br> Trial Court Cause Nos. 79D03-1803-JT-44 79D03-1803-JT-45 79D03-1803-JT-46 |

---

[1] The parental rights of T.B., the biological father of J.B. and T.R., and D.W., the alleged biological father of J.R., were also terminated in proceedings below. Neither participates in this appeal.

**Bradford, Judge.**

# Case Summary

[1]     S.R. ("Mother") is the biological mother of T.R., J.B., and J.R. (collectively, "the Children"). In December of 2015, the Indiana Department of Child Services ("DCS") removed the Children from Mother's home after receiving a report that she had left them alone for several hours. After the juvenile court found the Children to be children in need of services ("CHINS"), it ordered Mother to participate in various services. Visitation could not occur immediately because Mother was incarcerated throughout much of 2016 and the early part of 2017. Mother's compliance with the visitation order was initially good but eventually deteriorated. Moreover, visitation was often tumultuous, involving a lack of discipline and/or arguments with the Children and/or the visitation supervisors. Mother was also largely noncompliant with the other ordered services, including orders to receive individual and family therapy. At the same time, the Children had developed varying degrees of behavioral issues, and J.R. and J.B. entered individual therapy. In March of 2018, DCS filed petitions to terminate Mother's parental rights in the Children ("the TPR Petitions"). At the termination hearing, the two DCS family case managers who had worked on the cases and the Children's court-appointed special advocate ("CASA") all opined that termination of Mother's parental rights was in the Children's best interests. Following the hearing, the juvenile court granted the TPR Petitions. Mother contends that DCS failed to establish

that termination was in the Children's best interests.  Because we disagree, we affirm.

# Facts and Procedural History

[2] Mother is the biological mother of T.R. (DOB June 4, 2011), J.B. (DOB March 21, 2010), and J.R. (DOB January 30, 2009).  On or around December 22, 2015, DCS received reports that Mother had left the Children alone for approximately six and one-half hours in her Lafayette home.  DCS removed the Children and petitioned to have them found to be CHINS on December 23, 2015.  On February 19, 2016, the juvenile court held an evidentiary hearing, after which it found the Children to be CHINS.  On March 18, 2016, the juvenile court ordered Mother, *inter alia*, to maintain contact with DCS, participate in a mental-health evaluation and follow all recommendations, and participate in home-based case management.

[3] There was initially no visitation referral because Mother was incarcerated off and on from March of 2016 until March of 2017.  DCS Family Case Manager Ambyr Wade ("FCM Wade") met with Mother on March 5, 2017, to arrange visitation with the Children in Indianapolis, where Mother was living with an aunt.  Initially, Mother only had visitation with J.B., who was also living in Indianapolis.  In July of 2017, Mother moved to Gary, where J.R. was residing at the time.  By August, arrangements had been made for visitation with the Children to occur in Gary, with J.B. being transported from Indianapolis and T.R. being transported from White County, where he was residing.

[4] At first, Mother was complaint with visitation with J.B. in Indianapolis, not missing any scheduled visitations. The situation seemed to deteriorate after Mother's move to Gary, however. Harold Daniels started supervising visits in September of 2017 and observed that the first visits he supervised were "rough." Tr. Vol. II p. 151. Mother did "some name calling" and did not properly discipline Children. Tr. Vol. II p. 151. She "grabbed [J.R.] roughly on a couple of occasions. She called him like a cry baby." Tr. Vol. II pp. 151–52. Mother also fell asleep during visits in September and October. Mother was not receptive to Daniels's feedback and she would yell and curse at him.

[5] Stephanie Parr supervised visits beginning in November of 2017. Parr attempted to work with Mother on parenting education, but Mother resisted. Mother also declined Parr's attempts to help her with home-based case work and housing. By November of 2017, Mother's participation in visits declined to the point where she missed half of her visits, and this continued through February of 2018. Mother missed all of the visits in March and April of 2018.

[6] When Mother did not attend scheduled visitation with the Children, they reacted negatively. In May of 2018, a visitation supervisor ended a visit fifteen minutes in because Mother and J.R. were yelling at each other. On June 2, 2018, Parr ended a visit early because Mother and J.R. were arguing. Parr explained that Mother and J.R. got into an "angry argument" that escalated to the point where they were "toe-to-toe" with each other. Tr. Vol. II p. 78. Parr ended the visit because J.R. was "almost out of control" and Mother's "very

stern" redirection of J.R. was not appropriate given that he was only nine years old. Tr. Vol. II pp. 78–79.

[7] As for other ordered services, Mother told DCS after she moved to Gary in July of 2017 that she did not want to continue with individual therapy. Mother had only participated in six sessions before she moved. DCS then referred Mother for family therapy, but she did not want to participate in that either. Still, a service provider tried to work with Mother on individual therapy, and the provider supervised therapeutic visits with Children from November of 2017 until the service closed out in May of 2018. The goals were for Mother to work on communication and set appropriate boundaries with Children. Mother, however, only scheduled five sessions—four in November of 2017 and one in January of 2018.

[8] Before Mother's move to Gary, she had completed an initial intake for a mental-health evaluation in Indianapolis but had never gone back to complete it. Mother did not complete a second referral until February of 2018. Mother did not timely arrive for her evaluation, and when the examiner called her, Mother said that she had forgotten about the appointment. When Mother arrived, the examiner observed that she "appeared agitated and hostile with aggressive mood." Ex. Vol. II p. 5. After approximately two hours, Mother agreed to undergo testing. Mother's testing indicated (1) that she had a valid, elevated abuse score which often resulted in physical child abuse; (2) that she had "inappropriate expectations for her children which exceeded their developmental capabilities[;]" (3) that she lacked "understanding of normal

child growth and development[;]" (4) "a consistent reversal of family roles, where children are used to meet adult needs[;]" (5) that "she has extremely variable and unpredictable moods, an embittered and resentful irritability" and lacked empathy; and (6) that she "lacks insight, good judgment, and exercises poor decision making[.]" Ex. Vol. II pp. 7, 8, 10. The evaluator's clinical impressions were (1) bipolar I disorder, current/most recent episode depressed, with psychotic features; (2) generalized anxiety disorder; (3) paranoid personality disorder; (4) unspecified personality disorder, negativistic/antagonistic type; and (5) narcissistic personality traits. The evaluator recommended that Mother participate in therapy, receive "extensive parenting education[,]" and be evaluated for possible medication management. Ex. Vol. II p. 10.

[9]  Meanwhile, on March 23, 2018, DCS filed the TPR Petitions. On June 19, August 27, and September 11, 2018, the juvenile court conducted an evidentiary hearing on the TPR Petitions. A DCS report to the juvenile court showed that the Children had been acting out and getting in trouble at school and home. *Inter alia*, (1) J.B. and J.R. had become physical with their peers and teachers; (2) J.B. had become defiant with teachers, roamed the halls, had lain down and refused to get up, had hit other students and staff, was stealing, and had recently been diagnosed with attention-deficit hyperactivity disorder ("ADHD"); (3) J.R. continued to have outbursts, be defiant, and get upset when Mother did not visit; and (4) T.R. had also acted out at school and

urinated on himself on several occasions. J.B. and J.R. were both in individual therapy as of June 19, 2018.

[10] The then nine-year-old J.R. had completed a psychological evaluation in March of 2018, and the report was released on April 5 and later admitted as DCS Exhibit 4. J.R. exhibited "[p]roblematic behaviors" including "insubordination, fire-setting, verbal/physical aggression, impulsivity, lying, and difficulties with peer relationships." Ex. Vol. IV p. 4. In one instance, J.R. fought with a younger child at his school "and responded by stomping on the child's face with his boot." Ex. Vol. IV p. 5. J.R. had previously been diagnosed with oppositional defiant disorder and ADHD, and his psychiatrist had sent a letter to DCS in November of 2017 noting that that he had been suspended from school at least three times since August of 2017, including once for bringing a toy gun and threatening to "blow the brains out" of a peer. Ex. Vol. IV p. 14. J.R. "becomes more defiant [and] irritable" when Mother cancels visits. Ex. Vol. IV p. 5. The evaluator noted that J.R. "has seen a significant amount of trauma throughout his life, including significant neglect in the home and repeated abandonment." Ex. Vol. IV p. 10. The evaluator's clinical impressions of J.R. included disruptive mood dysregulation disorder; ADHD, unspecified type; and major depressive disorder, recurrent and moderate. The evaluator recommended that J.R. receive the assurance of a nurturing, stable home environment; family therapy with his siblings; counseling; and medication management but did not recommend therapy with Mother.

[11] Therapist Traci Coney began providing J.R. with individual therapy in May of 2017 and was still working with him as of June of 2018. J.R.'s therapeutic goals are to "decrease his behavior problems, discuss his traumatic past, emotional regulation and for him to learn skills to manage […] symptoms from his diagnosis." Tr. Vol. II p. 25. Coney's description of J.R.'s behavioral issues echoed what was in his psychological evaluation. According to Coney, J.R. needs to continue in therapy because of the inconsistency, abandonment, and neglect that he had experienced.

[12] Coney started working with J.B. in May of 2018, but only had approximately four sessions with her by June 19. J.B.'s therapeutic goals were to address her sadness and impulse control. J.B. had improved in therapy, and Coney recommended that she continue. Coney also recommended that J.B. be evaluated to see if medication would help with her ADHD.

[13] Home-based therapist Bonnie Atkins worked with all three Children in August and September of 2016 and stopped working with T.R. in September of 2016, J.B. in February of 2017, and J.R. in March of 2017. Atkins observed "a lot of fighting" between the Children in their foster home, with Atkins noting that they "had a hard time getting through a [board] game without one of them becoming very escalated[.]" Tr. Vol. II p. 58. Atkins indicated that J.R. progressed when she worked with him, learning coping skills for anger, while J.B. progressed "quite a bit[,]" becoming able to use coping skills when frustrated or upset and identify "safe" persons. Tr. Vol. II p. 58–59.

[14] Hilary Laughner was appointed as Children's CASA in February of 2018. CASA Laughner testified that she was concerned with Mother's lack of consistency in participating in services, and the Children's negative reactions when Mother missed visits. CASA Laughner noted Mother's lack of documentation regarding Mother's concerns, her dishonesty, her lack of responsibility, and that Mother became verbally aggressive when confronted with issues. CASA Laughner was also concerned with Mother's failure to properly supervise Children during visits and her lack of housing and employment stability. CASA Laughner noted that J.R. was more verbally and physically aggressive and that J.B. exhibited "an increase in behaviors" when Mother missed her visitation appointments. Tr. Vol. III p. 4.

[15] FCM Christopher Lamar took over the case from FCM Wade in May of 2018. FCM Lamar and CASA Laughner testified that at a child and family team meeting in May of 2018, Mother seemed to blame everyone else for the case going on for so long, became verbally aggressive, and left the room. Mother was still not accepting responsibility and she "still blames DCS and everyone else for her current situation." Tr. Vol. 2 p. 242.

[16] FCM Wade testified that termination was in Children's best interests because they need to know what is going to happen to them after three years of not knowing. FCM Lamar also testified that termination was in Children's best interest because Children need permanency "soon" and Mother had not made enough progress. Tr. Vol. 2 p. 236. CASA Laughner testified that termination was in the Children's best interests because "they deserve permanency, they

need something that's stab[le,] they deserve to know what the next step is[, a]nd so as individuals that they can grow and that they can be given a stable life." Tr. Vol. III pp. 10–11. CASA Laughner opined that continuing the parent–child relationship between Mother and the Children would be harmful to them. DCS's plan for the Children if the court granted termination was adoption. J.B. and T.R were in pre-adoptive placements, and J.R.'s placement was uncertain and awaiting the outcome of the termination hearing. On November 21, 2018, the juvenile court entered its orders terminating Mother's parental rights in the Children.

# Discussion and Decision

[17] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id.*

[18] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental*

*Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[19] Indiana Code section 31-35-2-4(b) governs what DCS must allege and establish to support a termination of parental rights, namely

> (A) that […] the following is true:
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>> [….]
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.

> [...]
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of
> the child.

Ind. Code § 31-35-2-4(b)(2).

[20] Mother contends that insufficient evidence supports the juvenile court's conclusion that termination is in the Children's best interests. We are mindful that in determining what is in the best interests of the Children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.* Furthermore, this court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992). FCMs Wade and Lamar and CASA Laughner all testified that termination was in the Children's best interests, essentially all on the basis that they needed and deserved permanence. While this testimony is likely sufficient to support the juvenile court's conclusion to that effect, it is not as though this testimony is unsupported by other evidence in the record.

[21] The record contains ample evidence that Mother's compliance with visitation and other services was sporadic at best, and her attitude toward service providers has consistently been antagonistic, noncooperative, and even abusive at times. Mother did not cooperate with attempts to provide her with

individual therapy, despite a mental-health evaluator's conclusion that it was needed. Mother also refused to fully participate in family therapy and declined offers for home-based services and assistance in finding housing. Mother has repeatedly blamed the Children's removal on others and has denied that she requires any services at all.

[22] Moreover, the record indicates that this case has taken a heavy toll on the Children. The Children have all exhibited behavioral problems to varying degrees since their removal—up to and including violence against teachers and peers—with J.R.'s and J.B.'s issues being severe enough to warrant individual therapy. CASA Laughner noted that while the Children's negative behaviors increased when Mother missed visitation, Mother failed to properly supervise them when she *did* attend. In summary, while the Children's removal from Mother's care introduced instability into their lives, Mother showed little inclination to take any of the steps necessary to secure their return to her.

[23] Mother points to evidence that her compliance with services improved after DCS filed the TPR Petitions. While we are mindful that the juvenile court must assess the parent's ability to care for the children as of the date of the termination proceeding and consider any evidence of changed conditions, it should also consider the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior. *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 620 (Ind. Ct. App. 2006), *trans. denied*. The juvenile court was in the best position to evaluate evidence of changed conditions, and, given the evidence of Mother's

demonstrated history of temporary compliance followed by regression, we will not second-guess its conclusions. *See S.P.H.*, 806 N.E.2d at 879. Mother has not established that the juvenile court's determination that termination was in the Children's best interests was clearly erroneous.

[24] The judgment of the juvenile court is affirmed.

Crone, J., and Tavitas, J., concur.