# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 22 2019, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle D. Gobel
Collier Gobel Homann, LLC
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent–Child Relationship of: E.S. (Minor Child)

and

H.S. (Mother),[1]

*Appellant-Respondent,*

*v.*

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 22, 2019

Court of Appeals Case No. 19A-JT-1063

Appeal from the Warren Circuit Court

The Hon. Hunter Reece, Judge

Trial Court Cause No. 86C01-1810-JT-58

---

[1] The parental rights of the biological father of E.S. are not at issue in this appeal because he has voluntarily relinquished his parental rights to her.

**Bradford, Judge.**

# Case Summary

H.S. ("Mother") gave birth to E.S. ("Child") in September of 2016, and, in August of 2017, brought her to an emergency room, near death. Child had multiple drugs in her system and was on the brink of respiratory arrest when a dose of Narcan was administered, saving her life. The Indiana Department of Child Services ("DCS") removed Child from Mother's care and petitioned to have her declared a child in need of services ("CHINS"), which petition was granted. Over the next few months, Mother tested positive for myriad drugs, failed to complete court-ordered services, and was charged with, *inter alia*, the crimes of neglect of a dependent causing serious bodily injury and operating a vehicle while intoxicated. In July of 2018, Mother was sentenced to a period of incarceration, with her earliest possible release date in January of 2020. In October of 2018, DCS petitioned to terminate Mother's parental rights to Child. In April of 2019, the juvenile court granted DCS's petition. Mother contends that the juvenile court's termination of her parental rights to Child is clearly erroneous. Because we disagree, we affirm.

# Facts and Procedural History

In mid-2016, while approximately seven months pregnant with Child, Mother ended her romantic relationship with Father, later explaining that Father had been incarcerated at the time and was therefore unavailable to parent. On September 4, 2016, Child was born with multiple drugs in her system, and

Mother tested positive for morphine and hydrocodone. DCS, however, did not remove Child because it was unable to rule out the possibility that morphine had been administered to Mother during the birth of the Child, and Mother had a prescription for hydrocodone.

[3] On August 3, 2017, at 1:30 p.m. Child arrived at St. Vincent Hospital in Williamsport. Child was lethargic to the point of being lifeless; had shallow, agonal, breathing; and was cyanotic, *i.e.*, her lips, face, legs, and arms were blue in color. Dr. Hector Torres, the emergency-room physician on call, recognized that Child was suffering an overdose of some sort and was on the verge of respiratory arrest and death. When Child was within thirty to sixty seconds of death, Dr. Torres and his team administered Narcan in a last-ditch attempt to reverse the effects of whatever Child had ingested. The Narcan relieved Child's symptoms. Dr. Torres ordered Child transferred to Peyton Manning Children's Hospital in Indianapolis because she needed special respiratory care. As it happened, Child tested positive for methamphetamines, opiates, amphetamines, methadone, and tricyclic antidepressants.

[4] Dr. Torres spoke to Mother multiple times the day of Child's incident and found her answers to be vague. DCS Family Case Manager Joshua DeZarn ("FCM DeZarn") was present at the hospital to assess the allegations of neglect and found Mother's behavior to be very erratic. Mother would alternate between being calm, crying hysterically, and screaming in anger. Mother told FCM DeZarn that she had gone to the kitchen to get Child a bottle and when she came back Child had something in her mouth. Mother claimed to have

fished the pill out of Child's mouth and insisted Child had not swallowed anything. Mother eventually told FCM DeZarn that there may have been methadone in her pill-keeper. Later still, Mother admitted there also may have been hydrocodone in her purse from an expired prescription.

Williamsport Deputy Town Marshal Sean Briles came to the hospital to assist DCS. Mother consented to a search of her home to determine how Child found drugs. Deputy Briles told Mother to stay out of the home until he arrived, but when he arrived at the home, Mother was walking out the front door. Deputy Briles did not bother to search the home because he assumed Mother had already destroyed anything in the home that might have been incriminating.

On August 4, 2017, DCS filed a petition to have Child adjudicated a CHINS. On August 10, 2017, Mother submitted to a drug screen and tested positive for amphetamines, methamphetamines, hydrocodone, and oxycodone. Mother also admitted she was using methadone to self-medicate herself because she was addicted to hydrocodone and suggested that Child's exposure to methadone might have come from her friend T.P.'s home surroundings and not from her methadone pills. On August 28, 2017, Mother was charged with neglect of a dependent causing serious bodily injury and possession of a controlled substance.

On September 20, 2017, the juvenile court found Child to be a CHINS. On October 25, 2017, the juvenile court appointed Jenna Beckett as Child's special advocate ("CASA Beckett"). On November 21, 2017, the juvenile court issued a dispositional order in which it ordered Mother to complete several services,

including individual counseling, a parenting assessment, substance abuse assessment, random drug screens, a psychological evaluation, and supervised visitation. Between October 5, 2017, and the end of the year, Mother tested positive for amphetamine five times, methamphetamine twice, and THC once. Between January 5 and 17, 2018, Mother submitted to five drug screens, all of which were positive for methamphetamine and amphetamine. The screens also indicated the use of Xanax, oxazepam, methadone, hydrocodone, hydromorphone, noroxycodone, oxycodone, oxymorphone, THC, and clonazepam.

[8] FCM Lindsey Winger received Mother's case from FCM DeZarn in August of 2017 and worked with Mother until May 23, 2018. FCM Winger referred Mother to a substance abuse assessment, an intensive outpatient program for substance abuse, home-based case management, supervised visits, a psychological examination, and individual therapy. Mother did not immediately attend the substance-abuse assessment. Once completed, the assessment recommended Mother complete an intensive outpatient program for substance abuse, and it was referred. Mother failed to appear or came late to the treatment sessions and was discharged for non-compliance. Mother also refused to submit to several drug screens and denied that she used methamphetamine.

[9] On January 21, 2018, Mother was arrested for operating a vehicle while intoxicated with a prior conviction and illegal possession of paraphernalia. As a condition of pre-trial release on these charges, Mother participated in drug

treatment at Home with Hope, a residential treatment facility, from March to May of 2018. In March of 2018, Mother submitted to a psychological evaluation from Dr. Jeffrey Vanderwater-Piercy. The purpose of the evaluation was to assess Mother's mental health and its effect on her ability to parent Child. Mother explained to Dr. Vanderwater-Piercy that DCS became involved when "[m]y kid took my prescription Adderall and methadone [Which was not prescribed] and I had to rush her to the ER." Ex. Vol. 5 p. 46 (second set of brackets in original).

[10] Dr. Vanderwater-Piercy diagnosed Mother with opiate use disorder, marijuana use disorder, agoraphobia, adjustment disorder with depressed mood, and attention deficit hyperactivity disorder with a predominantly inattentive presentation. Dr. Vanderwater-Piercy found Mother to have below-average intelligence. He concluded that Mother had an extensive history of substance dependence which should be treated.

[11] Ultimately, Dr. Vanderwater-Piercy found that Mother was having considerable difficulty managing her own life, much less being able to provide the type of stability, support, emotional nurturing, and structure that would be required to adequately parent Child. Dr. Vanderwater-Piercy felt the mental issue which most affected her role and responsibility as a parent was the substance abuse and some very significant maladaptive personality traits. Dr. Vanderwater-Piercy did not believe individual therapy could provide Mother with any real meaningful progress on the problematic personality traits until she had her substance abuse under control and had completed a period of

abstinence and sobriety. In May of 2018, Mother was discharged from Home with Hope because she used anti-diarrhea pills to get high. On June 22, 2018, Mother tested positive for methamphetamine and amphetamine.

[12] On June 28, 2018, the service providers, FCM Amy Turner (who had taken over the case on May 23, 2018), and the guardian *ad litem* ("GAL") met with Mother to discuss her progress. When asked about her positive drug screen results, Mother admitted that she had used "something" but would not admit it was methamphetamine. Tr. Vol. II p. 240. The positive methamphetamine results were, Mother explained, "a quality control issue[] with drug dealers in the area." Tr. Vol. II p. 240. At the meeting, Mother reluctantly agreed to attend a residential drug treatment program in Crawfordsville. Mother did not follow through with the facility in Crawfordsville. DCS also offered to send Mother to an inpatient mental health placement before she went to drug treatment, but she did not want to be locked up with "crazy" people. Tr. Vol. III p. 25. DCS offered to send Mother back to Home with Hope as well, but she did not want to return.

[13] Meanwhile, Mother's experience with court-ordered visitation was mixed. Supervised visits occurred between Mother and Child between March 16 and July 11, 2018. Mother attended nine of these visits, cancelled once, and failed to appear twice at the end. At the May 28, 2018, visit, Mother became argumentative and confrontational with maternal grandfather and step-grandmother because they were taking Child to Florida and Mother had wanted to be the first one to take Child to Florida. After this incident, Child

would be dropped off early, and Mother stayed inside while the grandparents picked Child up, so there would be no interaction between the adults.

[14] At the visit on July 11, 2018, Amy Schaller, the visitation supervisor, became concerned that Mother was under the influence. Mother was late to the visit, her mind and actions were scattered, she was irritated for unknown reasons, and she failed to bring food with her for Child. Schaller required Mother to screen for drug use and the test came back positive for methamphetamine, amphetamine, THC, Xanax, diazepam, and oxycodone. Schaller remembered discussing whether to suspend visits, but instead they required Mother to screen before visits. Mother, however, never appeared for another visit.

[15] On July 31, 2018, Mother was sentenced in both the August of 2017 and January of 2018 cases, and her earliest release date from the Department of Correction is January 6, 2020. On October 29, 2018, DCS filed its petition to terminate Mother's parental rights to Child ("the TPR Petition"). Mother visited with Child one more time in prison on December 20, 2018. CASA Beckett attended this visit and noticed during the visit that Mother struggled with parenting. Mother did not appear to have the skills needed in order to calm Child when Child became upset. Mother did not engage with Child with age-appropriate language and questions.

[16] On January 31 and March 1 and 22, 2019, the juvenile court held a hearing on the TPR Petition. Mother testified to having tried "every single drug out there except for acid" and admitted that she was addicted to opiates. Tr. Vol. III p. 81. Mother claimed that she had begun using hydrocodone when she was

eighteen, after she was injured in an accident which occurred while she was under the influence. Mother testified that she did not know she was pregnant with Child until she was perhaps three months along, and she resumed using hydrocodone after her appendectomy at around the fourth month. When the hydrocodone prescription ran out, Mother "was getting them off of the street." Tr. Vol. III p. 83. For the first six months after Child was born, Mother explained she used hydrocodone three or four times a day, which eventually progressed to using any opiate she could find. Mother admitted to using methamphetamine on occasion to stay awake.

[17] Mother admitted that, at the time of Child's removal in August 2017, Child had access to Adderall and methadone from her purse. Mother testified that she refused to submit to a drug screen at the hospital because it would have been positive for methamphetamine and hydrocodone. Despite testing positive for methamphetamine multiple times, Mother never admitted to DCS or providers she was using it until trial.

[18] Mother guessed that Child found and ate the methamphetamine "from being at the house" which belonged to her friend, T.P. Tr. Vol. III p. 91. Mother said that she had no idea where the mood stabilizer came from. According to Mother, T.P. provided her with hydrocodone and she had seen him use methamphetamine. Mother blamed T.P. for the drug episode because he let her use drugs in his house. Mother testified that T.P. was responsible for Child's ingestion of drugs because "he allowed me to use [drugs] under his roof" and by

"not living life uh, by human law." Tr. Vol. III p. 131. Mother continued to be in regular contact with T.P. while in prison.

[19] FCM Turner testified that termination was in Child's best interests because there had been a lack of engagement in treatment, Mother had never made a commitment to change, and Mother had failed to comply with services. DCS was concerned Mother would continue to use illegal substances once she was released from incarceration.

[20] CASA Beckett testified that it was in Child's best interests to terminate the parent–child relationship because Child was reaching the age of understanding. CASA Beckett opined that Child needed stability and permanency while she progressed through school and that maternal grandfather and his wife could give that to her. In CASA Beckett's view, Mother still posed a threat to Child because of the risk of further exposure to illicit substances, lack of stable housing, and lack of employment. Mother still refused to commit to change and has reservations about any form of treatment.

[21] Maternal grandfather was Child's foster placement, and he testified that it was in Child's best interests to terminate the parent–child relationship because Mother has problems maintaining a valid driver's license, staying sober, staying out of jail, not breaking the law, and keeping a job. Maternal grandfather also had experience with Mother becoming violent with her own family members, even her grandmother and others she truly cares about. He was afraid of Child being around Mother because she might violently lash out at Child.

On April 22, 2019, the juvenile court issued an order terminating Mother's parental rights to Child. The order provides, in part, as follows:

a. [T]here is a reasonable probability that,

1. The conditions that resulted in [Child]'s removal or the reasons for the placement outside the parent's home will not be remedied in that: the mother's mental health; ongoing choice to use controlled substances when coupled with the totality of the evidence in this case and findings set forth above, support such finding; and

2. Continuation of the parent–child relationship poses a threat to the well-being of [Child] in that: the mother's mental health, ongoing choice to use controlled substances, Mother's instability, and when coupled with the totality of the evidence in this case and findings set forth above, place [Child] at continued serious risk of harm.

b. Termination is in the best interest of [Child] in that: the FCM and CASA have joined in the opinion it is in [Child]'s best interests; [Child] is well bonded to current placement; the Mother's conduct during the time she was the primary care giver posed a grave threat to [Child]'s life; Mother's conduct following removal showed wholesale inability or refusal to address her substance abuse issue or improve her parenting skills; and when coupled with the totality of the evidence in this case and findings set forth above, lead to the finding of termination in [Child]'s best interests.

c. The Department of Child Services has a satisfactory plan for the care and treatment of [Child] which is: Adoption by the maternal grandfather and maternal step-grandmother, who have been the relative placements since removal, and enjoyed a relationship with [Child] before removal, and do not foreclose all opportunity for [Child] to know her Mother.

Order pp. 9–10.

# Discussion and Decision

[23]     The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id*.

[24]     In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*. In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id*. A

finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

Indiana Code section 31-35-2-4(b) governs what DCS must allege and establish to support a termination of parental rights, namely

> (A) that […] the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> [….]
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied [or]
>>
>> (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.
>>
>> […]
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Mother contends that insufficient evidence supports the juvenile court's conclusion that (1) there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home of the parents will not be remedied, (2) there is a reasonable

probability that the continuation of the parent–child relationship poses a threat to the well-being of the child, and (3) termination is in Child's best interests.

# I. Indiana Code Section 31-35-2-4(b)(2)(B)

Mother argues that DCS has failed to establish that there is a reasonable probability that the reasons for Child's continued removal would not be remedied or that there is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of Child. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only establish one of these circumstances. *See* Ind. Code § 31-35-2-4(b)(2)(B) (providing that DCS must establish that one of the following is true: "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[, t]here is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child[, or t]he child has, on two (2) separate occasions, been adjudicated a child in need of services").

We choose to first address Mother's contention that DCS failed to establish that there is a reasonable probability that the conditions that led to Child's removal will not be remedied. In making such a determination, a juvenile court engages in a two-step inquiry. First, the juvenile court must "ascertain what conditions led to their placement and retention in foster care." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying these initial conditions, the juvenile court must determine whether a reasonable probability exists that the conditions justifying a child's continued "placement outside the

home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citation omitted). The statute focuses not only on the initial reasons for removal "but also those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. In making this second determination, the juvenile court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re D.D.*, 804 N.E.2d at 266. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[28] Here, Child was removed because, while in Mother's care, she somehow ingested several drugs and nearly died of respiratory arrest. While that particular emergency has abated, Mother's continuing drug use—and its negative impact on all aspects of her life—is the primary reason for Child's continued placement outside her home. Mother's history since Child's removal has been one of recurrent drug abuse, involving periods of abuse, followed by periods with no positive screens, and then relapse. Soon after Child was removed, Mother began regularly testing positive for methamphetamine and amphetamine, with various other drugs occasionally appearing in the test results. Although Mother went through a period in 2018 during which she had several consecutive negative screens, her final screen before her incarceration was positive for methamphetamine, amphetamine, THC, Xanax, diazepam, and oxycodone. Since Child's removal, Mother has yet to complete any drug-

treatment services, nor has she been able to maintain sobriety for any significant amount of time. Moreover, Mother continues to maintain contact with T.P., the person she blames for Child's overdose and who has supplied Mother with illegal drugs in the past. Mother has also failed to complete any of her court-ordered services successfully, and there is no evidence that she has obtained stable employment or housing, or has even tried. In summary, there is ample evidence to support a conclusion that Mother has a very serious substance-abuse problems that negatively affect her ability to parent and very little evidence that she wishes to take even modest measures to address them.

[29] The Indiana Supreme Court has made clear that the "purpose of terminating parental rights is not to punish parents, but to protect the children." *Egly v. Blackford Cty. Dep't. of Pub. Welfare*, 592 N.E.2d 1232, 1234–35 (Ind. 1992). The *Egly* Court also explained that "[a]1though parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents." *Id*. at 1234. Given the evidence of Mother's unaddressed substance-abuse problems (whether she is unable to address them or merely unwilling), the juvenile court did not err in finding that there was a reasonable probability that the conditions that had led to Child's removal would not be remedied.[2]

---

[2] Because of our disposition of this claim, we need not address Mother's claim that DCS failed to establish that there is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of Child.

## II. Indiana Code Section 31-35-2-4(b)(2)(C)

[30] We are mindful that in determining what is in the best interests of the Children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id*. Furthermore, this court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992). Here, FCM Turner and CASA Beckett both testified that termination was in Child's best interests. While this testimony is likely sufficient to support the juvenile court's conclusion to that effect, it is not as though this testimony stands alone.

[31] As of the date of the termination hearing, Mother remained incarcerated, with a release date in January of 2020, at the earliest. FCM Turner testified that termination was in Child's best interests because of Mother's lack of interest in progress and concerns that her substance abuse would continue after her release. Given Mother's history, these concerns seem well-founded. CASA Beckett testified that it was in Child's best interests to terminate the parent–child relationship because Child the needed stability and permanency that maternal grandfather and his wife could give that to her. CASA Beckett also cited the risk of further exposure to illicit substances, Mother's lack of stable housing and employment, and Mother's refusal to address her issues. Finally,

Mother's own father testified that it was in Child's best interests to terminate the parent–child relationship because of Mother's unaddressed issues, instability, and violent tendencies.

[32] The juvenile court must not only assess the parent's ability to care for the child as of the date of the termination proceeding and consider any evidence of changed conditions but also consider the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior. *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 620 (Ind. Ct. App. 2006), *trans. denied*. Given Mother's history of substance abuse, instability, and refusal to acknowledge or address her issues, she has not established that the juvenile court's determination that termination was in the Child's best interests was clearly erroneous.

[33] The judgment of the juvenile court is affirmed.

Vaidik, C.J., and Riley, J., concur.